JOSEPH O'MARA, A MINOR, BY AND THROUGH HIS GUARDIAN AD LITEM, LARRY REAVIS; AND JANELLA O'MARA, PLAINTIFFS v. WAKE FOREST UNIVERSITY HEALTH SCIENCES; NORTH CAROLINA BAPTIST HOSPITAL; FORSYTH MEMORIAL HOSPITAL, INC., AND NOVANT HEALTH, INC., DEFENDANTS

No. COA06-1067

(Filed 3 July 2007)

## 1. Medical Malpractice— standard of care—local vs. national

The trial court did not err in a medical malpractice case by excluding the testimony of one of plaintiff's expert witnesses based on the doctor's use of a national standard of care, because: (1) plaintiffs failed to include the doctor's deposition in the record on appeal, and thus, it cannot be assessed whether his testimony, when viewed in its entirety, meets the standard of N.C.G.S. § 90-21.12; (2) the twelve pages from the doctor's 100 page deposition that plaintiffs included in the appendix do not establish the doctor has the requisite familiarity with the local standard of care, and plaintiffs failed to direct attention to any other testimony pertinent to the doctor's competence as an expert on the standard of care applicable to defendant hospital's medical staff; and (3) although plaintiffs bring forward new theories that were not argued before the trial court, any

issues and theories of a case not raised below will not be considered on appeal.

## 2. Medical Malpractice— exclusion of testimony—standard of care

The trial court did not err in a medical malpractice case by excluding testimony by a nurse defense witness that in certain situations the failure to discontinue the use of pitocin would constitute a violation of the standard of care required of nurses, because: (1) there was no foundation for the witness's testimony when the nursing standard was never established; (2) "some evidence" of negligence does not constitute proof that violation of a hospital policy is a per se violation of the standard of care; and (3) in a medical malpractice action, the standard of care is normally established by the testimony of a qualified expert, and plaintiff failed to offer such testimony regarding the duty of care of a labor and delivery nurse.

## 3. Witnesses— qualification of defendant as an expert— negligence

The trial court did not err in a medical malpractice case by concluding that plaintiffs' allegations of negligence against a nurse did not preclude her from qualifying as an expert, because: (1) contrary to plaintiffs' assertion, *Sherrod v. Nash General Hospital*, 348 N.C. 526 (1998), did not hold that a defendant could not be qualified as an expert, but only that the ruling should be made outside the presence of the jury; and (2) contrary to plaintiffs' assertion, the trial court gave them an opportunity to tender the nurse as an expert witness.

## 4. Medical Malpractice— violation of hospital's policy— standard of care—denial of instruction

The trial court did not err in a medical malpractice case by denying plaintiffs' request for an instruction to the jury that violation of the hospital's policy regarding administration of pitocin was evidence of the proper standard of care for obsetetric nurses, because: (1) plaintiffs failed to establish either the standard of care for nurses in relation to administration of pitocin, or whether violation of the hospital's policy manual would also constitute a violation of the applicable standard of care; (2) violation of a hospital's policy is not necessarily a violation of the applicable standard of care when the hospital's rules and policy may reflect a standard that is above or below what is generally con-

sidered by experts to be the relevant standard; and (3) in the specialized context of intrapartum càre, proof of medical malpractice or deviation from the standard of care requires a plaintiff to first establish what the standard of care is, and plaintiffs in the instant case failed to do so.

## 5. Medical Malpractice— denial of special instruction—standard of care—specialized professional skills

The trial court did not err in a medical malpractice case by instructing the jury that in determining the standard of care, the jurors were to consider only the testimony of experts who had spoken to this issue and not their own views on the matter, because: (1) there are no cases in which the standard of care in a medical malpractice action involving specialized professional skills, such as those required of a labor and delivery nurse, was established in part by the jurors' own views on the matter; and (2) N.C.G.S. § 90-21.12 contradicts plaintiffs' contention.

## 6. Medical Malpractice— doctor testimony—possible genetic explanations for condition

The trial court did not err in a medical malpractice case by admitting the testimony of two defense doctors regarding possible genetic explanations for the minor child's condition, because: (1) plaintiffs do not articulate how the exclusion of this evidence would have been likely to change the outcome of the trial; (2) assuming arguendo that the testimony was inadmissible, plaintiffs failed to show prejudice; and (3) a review of the evidence revealed that it was highly unlikely that this testimony had any significant effect on the jury's verdict.

## 7. Trials— bias—judge questioning witness—clarifying testimony

The trial court in a medical malpractice case did not show bias against plaintiffs by questioning a medical witness of plaintiffs because: (1) the trial court's questions focused on the mechanics of difficult scientific concepts and were for the purpose of clarifying testimony for the jury's benefit; (2) the trial court asked plaintiffs several times, out of the jury's presence, to put on the record any questions by the court that plaintiffs found prejudicial, but they did not do so; and (3) the trial court exhibited fairness and poise during a long and difficult trial.

**8. Costs— expert witnesses—travel expenses—exhibits**

The trial court erred in a medical malpractice case by awarding certain costs to defendants, and the trial court's order is remanded to reduce the costs to $22,595.33, because: (1) charges for expert witnesses' testimony are not recoverable where the expert witnesses were not placed under subpoena, the record does not show that certain expert witnesses were placed under subpoena, and the trial court did not make a finding that the witnesses were placed under subpoena; (2) the trial court erred by awarding costs to defendants for their expert witnesses' review, preparation, and consultation with defense counsel; and (3) travel expenses for defendants' employees and expenditures associated with obtaining and displaying trial exhibits are not recoverable.

Appeal by plaintiffs from judgment entered 30 November 2005 by Senior Resident Judge Michael E. Helms in Yadkin County Superior Court. Heard in the Court of Appeals 22 March 2007.

*Law Offices of Wade E. Byrd, P.A., by Wade E. Byrd; and The Lawing Firm, P.A., by Sally A. Lawing, for plaintiff-appellants.*

*Wilson & Coffey, L.L.P., by Tamura D. Coffey, and Linda L. Helms, for defendant-appellees.*

*White & Stradley, LLP, by J. David Stradley, for Amicus Curiae North Carolina Academy of Trial Lawyers.*

*Yates, McLamb, & Weyher, L.L.P., by John W. Minier, Maria C. Papoulias, and Oliver G. Wheeler, IV, for Amicus Curiae North Carolina Association of Defense Attorneys.*

LEVINSON, Judge.

The present appeal arises from a medical malpractice action. Plaintiffs appeal from a judgment and order decreeing that they recover nothing from defendants, and taxing the costs of the action against plaintiffs. We affirm in part and reverse in part.

Plaintiff Janella O'Mara (Janella) is the mother of plaintiff Joseph O'Mara (Joseph), born 28 July 2001 at defendant Forsyth Memorial Hospital (the hospital). Joseph, who is profoundly disabled, suffers from spastic quadriparetic cerebral palsy, and diffuse cystic encephalomalacia. On 20 May 2004 plaintiffs filed suit against defendants, seeking damages for medical malpractice. Plaintiffs alleged that

Joseph's cerebral palsy was caused by brain damage resulting from intrapartum asphyxia, or oxygen deprivation during birth. Plaintiffs also alleged that Joseph's injury could have been prevented if defendants had properly responded to certain indications of fetal distress during Joseph's birth. Defendants answered and denied the material allegations of the complaint. The trial of this matter lasted several weeks. We will discuss the evidence pertinent to the issues presented on appeal, but do not attempt to summarize all of the evidence.

Certain facts are largely undisputed including, in relevant part, the following: At the time of Joseph's birth, Janella was eighteen years old and was living with her parents. She described herself as a "slow learner" and was in special education classes in school. In May 2001, shortly before she graduated high school, Janella went to a local medical clinic and learned that she was seven months pregnant. She received prenatal care at the clinic for the last two months of her pregnancy. Defendant Wake Forest University Health Sciences operates a medical residency program at the hospital. The residency program is under contract to deliver babies whose mothers, like Janella, do not have a private physician. They work in teams of four, consisting of three medical residents and one supervising ob/gyn physician.

On the morning of 27 July 2001 Janella was admitted to the hospital in the early stages of labor. She was given a bed, her vital signs were recorded, and an external fetal heart monitor was used to record her baby's heartbeat. At the time of her arrival the baby's heartbeat was within the normal range, and there were no signs of labor complications. Janella was given epidural anesthesia, and the first twelve hours of her labor were relatively uneventful.

At around 7:00 p.m. the hospital shift changed, and a new team of health care providers arrived. Thereafter Janella was attended by Dr. Heather Mertz, an obstetrician-gynecologist (ob/gyn); Dr. Anna Imhoff, the chief medical resident; Dr. Michael Potts, a third year medical resident; Dr. Felicia Nash, a first year medical resident; and Dana Morris, a registered nurse. During this time the drug pitocin was administered intermittently, and an internal fetal heart monitor was put in place. The parties generally agree that Janella's labor progressed normally until around midnight, with no signs of fetal distress serious enough to compromise the baby's health or require an emergency surgical delivery.

After midnight Janella was in the stage of labor characterized by the mother's "pushing" during contractions in order to deliver the

baby. A disputed issue at trial was the proper interpretation of the fetal heart monitor strip for this stage of labor. The parties agree, however, that there were indications of fetal distress during the last half hour before Joseph's birth. At 3:28 a.m. Dr. Mertz came to Janella's room for the first time and remained until after Joseph's birth. When Joseph was born at 3:52 a.m., he was limp, his skin was blueish, he was unable to breath, and he did not exhibit the neonatal suck, grasp, or startle reflexes. Joseph remained in the hospital until 7 August 2001, and then was transferred to North Carolina Baptist Hospital for several weeks until Janella could take him home.

It is not disputed that Joseph is profoundly disabled and suffers from cystic encephalomalacia and spastic quadriparetic cerebral palsy. He cannot roll over or sit up, but must lie on his back. He has little or no vision, cannot control the movement of his limbs or head, cannot swallow or talk, and will always have to wear diapers. He has esophogeal reflux disease, and is fed through a tube in his stomach. He cannot walk, talk, or care for himself. He also suffers from a seizure disorder and asthma.

The parties presented conflicting evidence as to whether medical malpractice during Joseph's birth was a cause of his brain damage. It was uncontradicted that the placenta, which supplied Joseph with nutrients and oxygen prior to birth, was abnormal. The parties' experts disagreed about the significance of placental disease, and about the correct interpretation of the available information about the placenta. Evidence was also introduced tending to show that certain risk factors for fetal health were present before birth, including: (1) Janella's failure to obtain prenatal care until she was seven months pregnant; (2) Janella's exposure to secondhand smoke in her house; and (3) the fact that Janella was anemic when she first came to the clinic. The parties disputed the relevance of these factors. Also, during labor and delivery, the medical staff assigned to Janella monitored the results of various measurements of Janella's and Joseph's status. Two of these measurements assumed particular significance during trial.

The first of these involved the drug pitocin, which was administered intravenously to Janella during her labor. Pitocin is often used in childbirth to increase the strength and frequency of uterine contractions. Because pitocin can also lead to reduced fetal oxygen, its use must be carefully supervised. The parties agree on the general criteria for administration of pitocin. However, they differ sharply on other issues pertaining to pitocin, including: (1) the accuracy of

the hospital's medical records as to whether pitocin was discontinued at some point before Joseph's birth; (2) whether or not the use of pitocin bore a causal relationship to Joseph's cerebral palsy; and (3) the relationship, if any, between the standard of care applicable to an obstetrical nurse and the hospital's rules for nurses regarding use of pitocin.

The other disputed issue arising from the measurement of maternal and fetal status during labor and delivery was the proper interpretation of the fetal heart monitor strip. Plaintiffs' experts testified generally that the fetal heart monitor strip showed that Joseph was experiencing significant oxygen deprivation and distress before birth, and that emergency delivery would have prevented Joseph's brain damage. Defendants' experts generally testified that the fetal heart monitor strip showed nothing alarming until the last few minutes before birth, and that there was no need for a surgical delivery because Janella delivered Joseph spontaneously just a few minutes after non-reassuring findings appeared on the fetal heart monitor strip.

Following the presentation of evidence the jury took less than an hour to return a verdict finding defendants not responsible for Joseph's cerebral palsy and other disabilities. Upon this verdict the trial court entered judgment dismissing plaintiffs' complaint with prejudice, and ordering plaintiffs to pay $181,592.50 in costs. From this judgment plaintiffs timely appeal.

## Standard of Review

"In a medical malpractice action, a plaintiff must show (1) the applicable standard of care; (2) a breach of such standard of care by the defendant; (3) the injuries suffered by the plaintiff were proximately caused by such breach; and (4) the damages resulting to the plaintiff." *Weatherford v. Glassman*, 129 N.C. App. 618, 621, 500 S.E.2d 466, 468 (1998) (citations omitted).

The scope of a physician's duty to his patient, the basis of any medical malpractice claim, was succinctly described by Justice Higgins in *Hunt v. Bradshaw*, 242 N.C. 517, [521-22], 88 S.E.2d 762, [765] (1955), as follows:

A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill and ability which others

similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and (3) he must use his best judgment in the treatment and care of his patient.

*McAllister v. Ha*, 347 N.C. 638, 642, 496 S.E.2d 577, 581 (1998). The first requirement is defined in N.C. Gen. Stat. § 90-21.12 (2005):

In any action for damages for personal injury or death arising out of the furnishing or the failure to furnish professional services in the performance of medical, dental, or other health care, the defendant shall not be liable for the payment of damages unless the trier of the facts is satisfied by the greater weight of the evidence that the care of such health care provider was not in accordance with the standards of practice among members of the same health care profession with similar training and experience situated in the same or similar communities at the time of the alleged act giving rise to the cause of action.

"Because questions regarding the standard of care for health care professionals ordinarily require highly specialized knowledge, the plaintiff must establish the relevant standard of care through expert testimony. . . . Further, the standard of care must be established by other practitioners in the particular field of practice of the defendant health care provider or by other expert witnesses equally familiar and competent to testify as to that limited field of practice." *Smith v. Whitmer*, 159 N.C. App. 192, 195, 582 S.E.2d 669, 672 (2003) (citing *Heatherly v. Industrial Health Council*, 130 N.C. App. 616, 625, 504 S.E.2d 102, 108 (1998)). In addition, "the witness must demonstrate that he is familiar with the standard of care in the community where the injury occurred, or the standard of care of similar communities. The 'same or similar community' requirement was specifically adopted to avoid the imposition of a national or regional standard of care for health care providers." *Smith*, 159 N.C. App. at 196, 582 S.E.2d at 672 (citing *Henry v. Southeastern OB-GYN Assocs., P.A.*, 145 N.C. App. 208, 210, 550 S.E.2d 245, 246-47 (2001)) (other citations omitted).

---

[1] Plaintiffs argue first that the trial court erred by excluding the testimony of one of their expert witnesses, Dr. Berke. During his deposition Dr. Berke testified that he was applying a national standard of care. For this reason, the trial court excluded his testimony. Plaintiffs assert that this was error.

Plaintiffs contend that "the foundation established in his deposition" qualified him to testify under N.C. Gen. Stat. § 90-21.12 (2005). Plaintiffs argue that a witness's use of a national standard of care does not automatically disqualify him or her from testifying if the expert's testimony, viewed as a whole, establishes that he is familiar with the standard of care in the same or similar communities. However, because plaintiffs have failed to include Dr. Berke's deposition in the Record on Appeal, we cannot assess whether his testimony, when viewed in its entirety, meets the standard of Section 90-21.12. The twelve (12) pages from Dr. Berke's 100 page deposition that plaintiffs included in their appendix do not establish that Dr. Berke has the requisite familiarity with the local standard of care, and plaintiffs fail to direct attention to any other testimony pertinent to Dr. Berke's competence as an expert on the standard of care applicable to the hospital's medical staff.

Plaintiffs further assert that, even if a proper foundation for Dr. Berke's testimony was not established at the deposition, the trial court nonetheless should have allowed plaintiffs the opportunity to call Dr. Berke as a witness and qualify him at trial. Plaintiffs concede that precedent allows the trial court to disqualify an expert witness on the basis of deposition testimony, but argue that the instant case is distinguishable because in other decisions neither "the fairness of such a result, or the dictates of Rule 32(d)(3)(a) [were] considered." Plaintiffs did not argue either of these theories before the trial court. "This Court has long held that issues and theories of a case not raised below will not be considered on appeal, and this issue is not properly before this Court." *Westminster Homes, Inc. v. Town of Cary Zoning Bd. of Adjust.*, 354 N.C. 298, 309, 554 S.E.2d 634, 641 (2001) (citing *Smith v. Bonney*, 215 N.C. 183, 184-85, 1 S.E.2d 371, 371-72 (1939), and *Weil v. Herring*, 207 N.C. 6, 10, 175 S.E. 836, 838 (1934)). This assignment of error is overruled.

---

[2] Plaintiffs argue next that the trial court erred in excluding testimony by a defense witness, Nurse Dana Morris, that in certain situations the failure to discontinue the use of pitocin would constitute a violation of the standard of care required of nurses. We disagree.

Plaintiffs failed to present expert testimony establishing the standard of care for nurses. Because the nursing standard was never established, there was no foundation for Morris to testify that a nurse's failure to discontinue the use of pitocin would, in certain circumstances, constitute a violation of the nursing standard of care.

We have considered and rejected plaintiffs' arguments to the contrary. Plaintiffs direct our attention to testimony by Morris, that the hospital's policy required nurses to discontinue the use of pitocin under the circumstances present in this case. Plaintiffs contend that Morris's testimony "establish[ed] that the national standard regarding nursing care was followed at Forsyth Memorial[.]" However, this presupposes that the "national standard regarding nursing care" was established by other evidence. In this regard, plaintiffs assert that "the national standard [Dr. Berke] described" is the same as the hospital's policy, thus establishing that Forsyth Memorial followed a national standard of nursing care as regards the use of pitocin. However, as discussed above, Dr. Berke's testimony was excluded, on the grounds that plaintiffs failed to properly qualify him as an expert witness.

Plaintiffs also assert that a violation of the nursing standard of care can be found, given that: (1) there was evidence from which the jury could find that pitocin was not turned off; and (2) the hospital's policy manual directed that pitocin be turned off under the conditions present at the time of Joseph's birth. "While the routine practice of Forsyth Hospital was thus presented, Nurse [Morris] shed no light whatsoever on whether that practice was in accordance with the standard of care[.]" *Clark v. Perry*, 114 N.C. App. 297, 313, 442 S.E.2d 57, 66 (1994).

Additionally, plaintiffs argue that they were not required to present expert testimony to establish the nursing standard of care. To support this position, plaintiffs cite ordinary negligence cases in which violation of a safety rule was held to be "some evidence of negligence." *See, e.g., Peal v. Smith*, 115 N.C. App. 225, 444 S.E.2d 673 (1994) (violation of company policy barring operation of machinery while under the influence of drugs or alcohol). Plaintiffs cite no medical malpractice cases concerning complex and technical aspects of childbirth wherein the standard of care was established by lay testimony or inferred from the mere violation of an institutional rule or policy. Moreover, we note that "some evidence" of negligence does not constitute proof that violation of a hospital policy is a *per se* violation of the standard of care.

"[I]n a medical malpractice action, the standard of care is normally established by the testimony of a qualified expert. This general rule is based on the recognition that in the majority of cases the standard of care for health providers concerns technical matters of 'highly specialized knowledge,' and a lay factfinder is 'dependent on

expert testimony' to fairly determine that standard." *Watkins v. N.C. State Bd. of Dental Exam'rs*, 358 N.C. 190, 196, 593 S.E.2d 764, 767 (2004) (quoting *Jackson v. Sanitarium*, 234 N.C. 222, 227, 67 S.E.2d 57, 61 (1951), *overruled in part on other grounds, Harris v. Miller*, 335 N.C. 379, 438 S.E.2d 731 (1994)). Plaintiff failed to offer such testimony regarding the duty of care of a labor and delivery nurse.

[3] Plaintiffs next argue that, because Morris was "a target of [p]laintiffs' allegations of negligence" she was "in the position of a defendant" which precluded them from qualifying her as an expert. In support of this position, plaintiffs cite *Sherrod v. Nash General Hospital*, 348 N.C. 526, 534, 500 S.E.2d 708, 713 (1998). However, *Sherrod* did <u>not</u> hold that a defendant could not be qualified as an expert, but only that the ruling should be made outside the presence of the jury:

> [W]hile it was entirely proper for the trial court to rule that defendant Thompson could testify as an expert, with the legal parameters and privileges incident to such ruling, it was prejudicial error for the trial court to announce to the jury that it in fact and law found defendant Thompson to be an expert.

*Id.* Plaintiffs further allege that the trial court did not give them an opportunity to tender Morris as an expert witness. This is inaccurate. At the close of Morris's testimony, the trial court specifically asked plaintiffs if they wanted to make an offer of proof as to Morris's competence to offer expert testimony, or what her testimony would have been. Plaintiffs did not voir dire Morris or tender her as an expert witness outside the presence of the jury.

Plaintiffs' remaining arguments concerning this issue are without merit. This assignment of error is overruled.

[4] Plaintiffs next argue that the trial court erred by denying their request for an instruction to the jury that violation of the hospital's policy regarding administration of pitocin was evidence of the proper standard of care for nurses. We disagree.

As discussed above, plaintiffs failed to establish either the standard of care for nurses in relation to administration of pitocin, or whether violation of Forsyth Memorial's policy manual would also constitute a violation of the applicable standard of care. Plaintiffs thus failed to present evidence supporting their proposed instruction, that violation of the hospital's policy regarding administration

of pitocin was *per se* evidence of a breach of standard of care for obstetric nurses.

In support of their contention that they were entitled to the requested instruction, plaintiffs cite ordinary negligence cases wherein the violation of a safety rule was held to be one piece of evidence showing negligence. However, violation of a hospital's policy is not necessarily a violation of the applicable standard of care, because the hospital's rules and policies may reflect a standard that is above or below what is generally considered by experts to be the relevant standard. As discussed above, in the specialized context of intrapartum care, proof of medical malpractice or deviation from the standard of care requires a plaintiff to first establish what the standard of care is. Plaintiffs did not do this, so their request for the proposed instruction was not supported by the evidence. This assignment of error is overruled.

[5] Plaintiffs also argue that, in addition to denying their request for a special instruction, the trial court misstated the law by instructing the jury that, "in determining the standard of care, they were to consider only the testimony of experts who had spoken to this issue and not their own views on the matter." Plaintiffs cite no cases, and we find none, in which the standard of care in a medical malpractice action involving specialized professional skills, such as those required of a labor and delivery nurse, was established in part by the jurors' "own views on the matter." Moreover, G.S. § 90-21.12 clearly contradicts plaintiffs' contention. This assignment of error is overruled.

---

[6] In the next two arguments, plaintiffs assert that the trial court committed reversible error by admitting the testimony of Dr. Virginia Floyd and Dr. Michael Pollard, regarding possible genetic explanations for Joseph O'Mara's condition.

Dr. Floyd, an ob/gyn with more than twenty-five years of practice, offered a detailed reconstruction of Janella's labor and Joseph's birth, including minute-by-minute analysis of fetal monitor strip in the context of other medical records. She offered an expert opinion that the health care providers responsible for managing Janella's labor and Joseph's delivery performed at or above the standard of care. Dr. Floyd strongly concluded that, based upon her extensive review, Joseph's cerebral palsy was not caused by intrapartum event(s). This opinion was the central focus of her testimony.

Dr. Floyd defended her opinion in part by reliance on criteria for diagnosis of neonatal encephopathology set out in a publication by the American College of Obstetricians and Gynecologists (ACOG). The ACOG requires a diagnosis of neonatal encephopathology before a further diagnosis can be made that brain injury was caused by an intrapartum hypoxia. Accordingly, Dr. Floyd reviewed the ACOG criteria for neonatal encephopathology. One of those criteria is the exclusion of other causes for the child's cerebral palsy.

In this context defense counsel briefly questioned Dr. Floyd about whether the child's medical record included other family members with illnesses or conditions that were "significant in the overall picture of this child's condition." Dr. Floyd testified that the baby's first cousin was "slow" and that his father had also suffered from neonatal breathing problems and had a seizure disorder. On cross-examination she conceded that the father's premature birth might explain his breathing problems, although "maybe not" as regards his seizure disorder.

Dr. Pollard's testimony about the possibility of a genetic aspect to Joseph's cerebral palsy was also offered in the context of his opinion that Joseph did not suffer from neonatal encephopathology at birth.

Plaintiffs argue that this testimony about the possibility of other causes for Joseph's cerebral palsy was inadmissible, on the grounds that it was speculative and not based on the medical record. However, plaintiffs do not articulate how the exclusion of this evidence would have been likely to change the outcome of the trial. Thus, even assuming, *arguendo*, that this testimony was inadmissible, plaintiffs have not shown prejudice. "The burden is on the appellant not only to show error, but to show prejudicial error, *i.e.*, that a different result would have likely ensued had the error not occurred. G.S. § 1A-1, Rule 61 [(2005)]." *Responsible Citizens v. City of Asheville*, 308 N.C. 255, 271, 302 S.E.2d 204, 214 (1983) (citations omitted). N.C. Gen. Stat. § 1A-1, Rule 61 (2005), Harmless Error, provides that:

> No error in either the admission or exclusion of evidence and no error or defect in any ruling or order . . . is ground for granting a new trial or for setting aside a verdict or for . . . disturbing a judgment or order, unless refusal to take such action amounts to the denial of a substantial right.

We also observe that, based on our own review of the evidence, it is highly unlikely that this testimony had any significant effect on the jury's verdict.

[7] Plaintiffs next argue that the trial court erred by excessively questioning witness Dr. Mertz, and that the court showed an apparent bias against plaintiffs by doing so. We disagree.

Under North Carolina Rule of Evidence Rule 614(b) (2005), the trial court "may interrogate witnesses, whether called by itself or by a party." Plaintiffs "concede[] the trial court has the authority to question a witness. . . . The court may question witnesses to clarify confusing or contradictory testimony." *State v. Carmon*, 169 N.C. App. 750, 757, 611 S.E.2d 211, 216 (2005) (citation omitted).

In the instant case, we have reviewed the entire transcript comprising twenty one volumes of testimony, and conclude that the trial court did not commit error or show bias in its questioning of Dr. Mertz or any other witness. This case involved complex medical issues regarding, *e.g.*, the stages of a normal labor and delivery; the measurements used by physicians to assess fetal status; the interpretation of a fetal heart monitor strip; parameters for use of pitocin; the criteria for neonatal encephopathology and the significance of this determination; the causes of cerebral palsy; and procedures such as the use of forceps that may be used in childbirth. The trial court's questions focused on the mechanics of these difficult scientific concepts, and were clearly for the purpose of clarifying testimony for the jury's benefit. Moreover, the court asked plaintiffs several times, out of the jury's presence, to put on the record any questions by the court that plaintiffs found prejudicial, but plaintiffs did not do so.

We conclude that the trial court exhibited fairness and poise during a long and difficult trial. This assignment of error is overruled.

[8] Finally, plaintiffs argue that the trial court erred by awarding certain costs to defendants.

Plaintiffs assert, and defendants concede, that charges for expert witnesses' testimony are not recoverable where the expert witnesses were not placed under subpoena. *See, e.g., Overton v. Purvis*, 162 N.C. App. 241, 250, 591 S.E.2d 18, 25 (2004). Because the record does not show that certain expert witnesses were placed under subpoena, and the trial court judge did not make a finding that the witnesses

were placed under subpoena, the trial court's judgment must be reversed to the extent that it awarded costs for the testimony of these persons. In a related argument, plaintiffs assert that the trial court erred by awarding costs to defendants for their expert witnesses' review, preparation and consultation with defense counsel. Consistent with this Court's opinion in *Morgan v. Steiner,* 173 N.C. App. 577, 584, 619 S.E.2d 516, 521 (2005), *disc. review denied,* 360 N.C. 648, 636 S.E.2d 808 (2006), we agree. Next, citing *Oakes v. Wooten,* 173 N.C. App. 506, 519-20, 620 S.E.2d 39, 48 (2005), plaintiffs assert that travel expenses for defendants' employees and expenditures associated with obtaining and displaying trial exhibits, are not recoverable. We agree.

After reviewing the record, we conclude that the trial court's award for costs must be reduced to $22,595.33, and direct the trial court to enter an order accordingly.

No error in part, reversed in part.

Judges BRYANT and STEELMAN concur.