TOMMY DAVIS NATHAN CAMERON, AND WIFE, LISA CAMERON, PLAINTIFFS v. MERISEL PROPERTIES, INC., AND BRIAN GOLDSWORTHY, DEFENDANTS

No. COA07-54

(Filed 6 November 2007)

## 1. Premises Liability— toxic mold in workplace—motion for JNOV—more than scintilla of evidence

The trial court did not err in a case seeking damages for bilateral vestibular dysfunction, allegedly caused by exposure to toxic mold in the workplace, by denying defendant's motion for JNOV, because plaintiff presented more than a scintilla of evidence through the testimony of several doctors that his condition was caused by exposure to mold in defendant's Cary facility, thus passing the threshold to submit the issue of causation to the jury.

## 2. Premises Liability— toxic mold in workplace—denial of motion for directed verdict—abuse of discretion standard

The trial court did not err in a case seeking damages for bilateral vestibular dysfunction, allegedly caused by exposure to toxic mold in the workplace, by denying defendant's motion for directed verdict even though defendant points to various weaknesses or inconsistencies in plaintiff's evidence, because: (1) the evidence must be viewed in the light most favorable to plaintiffs, deeming their evidence to be true, resolving all conflicts in their favor, and giving them the benefit of every reasonable favorable inference; (2) the Court of Appeals does not have the right to weigh the evidence and decide the issue on the basis of its weight; and (3) although defendant contends, as an alternative, entitlement to a new trial on the grounds that the jury's verdict was against the greater weight of evidence, defendant failed to articulate any specific abuse of discretion.

## 3. Evidence— toxic mold in workplace—respiratory and other medical complaints of co-workers

The trial court did not abuse its discretion in a case seeking damages for bilateral vestibular dysfunction, allegedly caused by exposure to toxic mold in the workplace, by admitting testimony of several of plaintiff's co-workers about respiratory and other medical complaints they reported to defendant because: (1) even assuming arguendo that defendant preserved its right to appellate review of the admission of the challenged evidence, the trial

court did not commit reversible error in its admission when defendant acknowledged the testimony was admitted solely to show notice to defendant and that the trial court gave a limiting instruction to that effect; and (2) plaintiff's health problems were sufficiently similar to those of his co-workers when the witnesses testified about problems with upper respiratory conditions and health effects to their ear, nose, or throat, and plaintiff's condition is centered in his inner ear.

## 4. Evidence— letter—addressed to associated corporate entity—notice

The trial court did not err in a case seeking damages for bilateral vestibular dysfunction, allegedly caused by exposure to toxic mold in the workplace, by admitting evidence that in January 2000, the individual in charge of property management for defendant's Cary facility received an OSHA·complaint about the Cary facility's air quality even though defendant contends the letter was addressed to nonparty Merisel Americas rather than to defendant Merisel Properties, Inc., because: (1) the letter was admitted on the issue of notice to defendant of the presence of mold in the building, and a limiting instruction to that effect was given; (2) defendant cited no cases, and none were found, holding that otherwise admissible evidence of notice is rendered inadmissible when the information was in an envelope addressed to an associated corporate entity rather than to defendant; and (3) even assuming arguendo some error, the admission of the OSHA complaint did not change the outcome of the trial.

## 5. Evidence— toxic mold in workplace—past and future economic damages

The trial court did not abuse its discretion in a case seeking damages for bilateral vestibular dysfunction, allegedly caused by exposure to toxic mold in the workplace, by admitting the testimony of two witnesses, including defendant's former supervisor and an expert in the evaluation of past and future economic damages, because: (1) not only did defense counsel fail to object to the former supervisor's testimony, but he explicitly told the trial court that proper questions were asked; and (2) the expert's trial testimony included certain revised lower figures for plaintiff's projected lost earnings than his previous higher numbers during deposition, his basic approach remained the same, and he indicated during his deposition that his figures were somewhat preliminary since the former supervisor had not been deposed yet.

**6. Damages and Remedies— remittitur—no showing of excessive award**

Defendant is not entitled to a new trial on damages or to a remittitur in a case seeking damages for bilateral vestibular dysfunction, allegedly caused by exposure to toxic mold in the workplace, even though it contends the jury's award was excessive and unsupported by competent evidence, because: (1) plaintiff's expert calculated plaintiff's lost earnings at between $4,000,000 and $6,000,000; (2) the jury verdict of $1,600,000 was significantly below the minimum figure projected by the expert; and (3) there was no evidence to show the trial court abused its discretion by failing to grant a new trial.

Appeal by Defendant from an order entered 14 February 2006 by Judge Michael R. Morgan; and from orders entered on 6 March 2006, 17 March 2006, 22 March 2006 and 10 May 2006, and judgment entered 4 April 2006, by Judge Robert H. Hobgood; all in Wake County Superior Court. Heard in the Court of Appeals 10 September 2007.

*Hunton & Williams LLP, by Steven B. Epstein, John D. Burns, and L. Neal Ellis, Jr., for Plaintiffs-Appellees.*

*Clausen Miller P.C., by Melissa A. Murphy-Petros and Edward M. Kay; and Cranfill, Sumner & Hartzog, L.L.P., by William W. Pollock, Jaye E. Bingham, and Dexter Campbell, III, for Defendants-Appellants.*

ARROWOOD, Judge.

Defendant, Merisel Properties, Inc., appeals from entry of judgment and from the denial of pretrial and posttrial motions. We affirm.

Merisel Americas, Inc., is a computer hardware and software company with an office in Cary, North Carolina (the Cary facility). Plaintiff Nathan Cameron (Cameron) worked at the Cary facility, which had a history of leaks and dampness, between December 1998 and April 2000. During this time he developed irreversible damage to his vestibular system, which is the inner ear organ responsible for balance. In 2002 Cameron and his wife, Plaintiff Lisa Cameron, filed a complaint "alleging that they suffered injury from a toxic workplace maintained by Merisel, Inc. (Merisel), Merisel Properties, Inc. (Merisel Properties), Merisel Americas, Inc. (Merisel Americas), and Brian Goldsworthy (Goldsworthy) (collectively Defendants). Specifically, Plaintiffs alleged that [D]efendants knew that the work-

place at which Mr. Cameron was employed was contaminated with toxic molds . . . [and] that due to [D]efendants' failure to warn or to take action to correct the mold problem, Mr. Cameron sustained debilitating, irreversible, and disabling injuries." *Cameron v. Merisel, Inc.*, 163 N.C. App. 224, 225, 593 S.E.2d 416, 418-19 (2004) (*Merisel I*). Plaintiffs brought claims against (1) Goldsworthy for willful and wanton conduct; (2) Merisel and Merisel Americas under *Woodson v. Rowland*, 329 N.C. 330, 407 S.E.2d 222 (1991), for intentional misconduct substantially certain to cause serious injury; and (3) Merisel Properties for simple negligence under a theory of premises liability. In addition, Plaintiffs sought punitive damages from all Defendants, and Lisa Cameron brought a claim for loss of consortium against all Defendants.

On 19 August 2002 the trial court granted Defendants' motion to dismiss Plaintiffs' complaint. On appeal, this Court affirmed the trial court's dismissal of Plaintiffs' *Woodson* claim as to Merisel and Merisel Americas; reversed the trial court's dismissal of Plaintiffs' claim against Goldsworthy and the associated claims for loss of consortium and punitive damages; reversed the trial court's dismissal of Plaintiffs' premises liability claim against Merisel Properties and associated claim for loss of consortium; and affirmed dismissal of Plaintiffs' punitive damages claim against Merisel Properties. The Court remanded for trial of Plaintiffs' "claim against Goldsworthy and the related loss of consortium and punitive damages claims[,] . . . as well as [P]laintiffs' premises liability claim against Merisel Properties and the corresponding loss of consortium claim." *Merisel I*, 163 N.C. App. at 235, 593 S.E.2d at 424.

On remand, Plaintiffs sought sanctions against Defendant Merisel Properties for abuse of discovery. By order entered 27 December 2005, the trial court sanctioned Merisel Properties by barring it from raising any defense or offering any evidence that the Cary facility was leased, and "establish[ing] as a fact" that the building was not subject to a lease. Defendants' pretrial motions for summary judgment and for exclusion of certain evidence were denied. Prior to trial Plaintiffs dismissed their claim for punitive damages.

The case was tried before a Wake County jury in March 2006. At the close of Plaintiffs' evidence and again at the close of all the evidence, Defendants moved for a directed verdict. Both motions were denied. On 27 March 2006 the jury returned a verdict finding Defendant Merisel Properties liable for damages of $1,600,000 for Cameron's claim and $200,000 for Lisa Cameron's loss of consortium

claim. Goldsworthy, who is not a party to this appeal, was found not liable. Defendant's posttrial motions for judgment notwithstanding the verdict (JNOV), a new trial, or remittitur of damages were denied on 10 May 2006. Defendant appeals from the entry of judgment; the denial of its pretrial motions in limine and motion for summary judgment; and the denial of its posttrial motion for JNOV, a new trial or remittitur.

---

**[1]** Defendant argues first that the trial court erred by denying its motion for JNOV. The trial court denied Defendant's motion for directed verdict at the end of Plaintiffs' evidence and its renewed directed verdict motion at the close of all the evidence. Defendant then moved for JNOV, on the grounds that its earlier directed verdict motions should have been granted.

> Our standard of review of the denial of a motion for directed verdict and of the denial of a motion for judgment notwithstanding the verdict are identical. "The standard of review of a ruling entered upon a motion for judgment notwithstanding the verdict [or a motion for directed verdict] is whether upon examination of all the evidence in the light most favorable to the non-moving party, and that party being given the benefit of every reasonable inference drawn therefrom and resolving all conflicts of any evidence in favor of the non-movant, the evidence is sufficient to be submitted to the jury."

*Denson v. Richmond Cty.*, 159 N.C. App. 408, 411, 583 S.E.2d 318, 320 (2003) (quoting *Branch v. High Rock Lake Realty, Inc.*, 151 N.C. App. 244, 249-50, 565 S.E.2d 248, 252 (2002)) (citation omitted). A motion for either directed verdict or judgment notwithstanding the verdict " 'should be denied if there is more than a scintilla of evidence supporting each element of the non-movant's claim.' " *Branch*, 151 N.C. App. at 250, 565 S.E.2d at 252 (quoting *Norman Owen Trucking v. Morkoski*, 131 N.C. App. 168, 172, 506 S.E.2d 267, 270 (1998)).

Plaintiffs' claim for premises liability was "based upon allegations of negligence. . . . 'It is well established that . . . the essential elements of negligence [are] duty, breach of duty, proximate cause, and damages.' " *Thomas v. Weddle*, 167 N.C. App. 283, 286, 605 S.E.2d 244, 246 (2004) (quoting *Camalier v. Jeffries*, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995)). Defendant challenges the sufficiency of the evidence of causation. Cameron was diagnosed with bilateral vestibular dysfunction, which he claimed was caused by his exposure to toxic

molds at work. We next determine whether Plaintiffs presented "more than a scintilla", *Norman Owen Trucking*, 131 N.C. App. at 172, 506 S.E.2d at 270, of evidence that Cameron's disorder was proximately caused by his exposure to mold.

Bilateral vestibular dysfunction is a complex medical condition, and in "cases involving 'complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury.' . . . 'The evidence must be such as to take the case out of the realm of conjecture and remote possibility, that is, there must be sufficient competent evidence tending to show a proximate causal relation.' " *Holley v. ACTS, Inc.*, 357 N.C. 228, 232, 581 S.E.2d 750, 753 (2003) (quoting *Click v. Pilot Freight Carriers, Inc.*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980); and *Gilmore v. Hoke Cty. Bd. of Educ.*, 222 N.C. 358, 365, 23 S.E.2d 292, 296 (1942)). "The quantum and quality of the evidence required to establish *prima facie* the causal relationship will of course vary with the complexity of the injury itself." *Click v. Freight Carriers*, 300 N.C. 164, 167, 265 S.E.2d 389, 391 (1980). However,

> "[a]lthough medical certainty is not required, an expert's speculation is insufficient to establish causation. Thus, could or might expert testimony [is] insufficient to support a causal connection when there is additional evidence or testimony showing the expert's opinion to be a guess or mere speculation."

*Singletary v. N.C. Baptist Hosp.*, 174 N.C. App. 147, 154, 619 S.E.2d 888, 893 (2005) (quoting *Holley*, 357 N.C. at 234, 581 S.E.2d at 754) (internal quotations and citations omitted). "Indeed, in order to be sufficient to support a finding that a stated cause produced a stated result, evidence on causation 'must indicate a reasonable scientific probability that the stated cause produced the stated result.' " *Phillips v. U.S. Air, Inc.*, 120 N.C. App. 538, 542, 463 S.E.2d 259, 262 (1995) (quoting *Hinson v. National Starch & Chem. Corp.*, 99 N.C. App. 198, 202, 392 S.E.2d 657, 659 (1990)).

In the instant case, Plaintiffs' evidence tended to show, in relevant part, the following: Before Defendant purchased the Cary facility in 1998, it obtained inspection reports indicating that the building had pre-existing problems with moisture and leaking in the building's windows and walls. Employees testified that they had seen mold on walls and noticed leaks and unpleasant "musty" smells in certain areas. Cameron began working at the Cary facility in December 1998,

and immediately noticed that the windows in his office leaked during every rainstorm. The walls, carpeting, and ceiling of his office all showed evidence of water damage, including the presence of mold. These problems increased during 1999; the office next to Cameron's flooded, areas of carpeting in the Cary facility were saturated with water, and mold spread on some walls.

Several of Cameron's co-workers testified that they experienced an array of respiratory, ear, nose, and throat problems, including asthma, sore throats, eye irritation, sinus congestion, frequent colds, hearing problems, and vertigo. These employees notified Defendant Goldsworthy, who was responsible for building maintenance. Goldsworthy in turn informed Defendant's administrators, but the Cary facility's problems with mold and moisture continued to worsen during most of 1999. Goldsworthy expressed the opinion that employees who claimed their health problems were related to moisture in the building were simply trying to avoid work.

In early 2000, Defendant assigned Candace Jost Miller to investigate and solve the moisture problems at the Cary facility. Air quality tests performed in November 1999 confirmed the presence of mold, and in January 2000 an employee lodged a complaint with the North Carolina OSHA. Thereafter, Miller assumed responsibility for the building maintenance that previously was assigned to Goldsworthy. In March 2000 further testing revealed the presence of *Stachbotrys* mold in Cameron's office.

When Cameron started working for Defendant, he was in excellent health. After working at the Cary facility for a few weeks, Cameron started to have problems with balance and vision. Over the following six months he suffered from periods of dizziness, visual anomalies, problems with balance, and increasing fatigue and difficulty concentrating. In July 1999 Cameron sought emergency medical treatment at Western Wake Medical Center for his condition. In the fall of 1999 he was diagnosed with permanent and irreversible bilateral vestibular dysfunction, or loss of the balance function in both inner ears. He was treated for vestibular dysfunction by Dr. Joseph Farmer.

Dr. Farmer testified at trial as an expert in the field of physiology of injuries or illnesses affecting the human ear. He told the jury that he had tested Cameron and eliminated most known causes of vestibular dysfunction, including brain tumor, chemotherapy drugs, ototoxic

chemicals, autoimmune illnesses, Arnold-Chiari syndrome, syphilis, skull fracture, and other diseases and agents that may damage vestibular function. Dr. Farmer concluded that Cameron's bilateral vestibular dysfunction was caused by ototoxicity, or poisoning of the ears. When he reviewed the results of the air quality sampling performed at the Cary facility in 2000, he learned that Cameron had been exposed to toxigenic molds, including *Stachybotrys* mold. Based on Cameron's exposure to *Stachybotrys* mold, the fact that Cameron's symptoms were sometimes associated with the mold, and the fact that Dr. Farmer had ruled out other known causes, Dr. Farmer concluded "that the cause of [Cameron's] loss of vestibular function in both ears was likely due to ototoxic—to a mycotoxin from the *Stachybotrys* fungus." On cross-examination, Dr. Farmer reiterated that "my best medical judgment is this was caused by the mold that he was exposed to, and the data indicate that he would have had a significant exposure."

Dr. Farmer's medical notes provide further support for his opinion. In *Workman v. Rutherford Elec. Membership. Corp.*, 170 N.C. App. 481, 495, 613 S.E.2d 243, 252 (2005), this Court held that Plaintiff's "expert evidence of causation exceeded 'speculation' " where the Defendant's "testimony of 'could or might,' together with his impression recorded in his treatment notes that [P]laintiff's [accident] 'more likely than not [was] related to his injury' is competent evidence to sustain the Commission's conclusion of law that [P]laintiff's [medical] conditions were caused by the accident." In the instant case, Dr. Farmer's medical notes stated that "I advised [Mr. Cameron] that it is my best medical judgment that the loss of balance function in both vestibular end organs was likely related to the exposure to toxic mold."

Dr. Eckhardt Johanning testified as an expert in the area of occupational and environmental medicine and the effects of mold on human health. Johanning testified that "more likely than not" the "competent cause" of Cameron's disorder was his exposure to mold. Plaintiffs also presented testimony from Dr. Tulis, who was qualified as an expert in mold science and assessment, control, and remediation of mold in indoor environments. Dr. Tulis testified that Cameron was exposed to mold and mycotoxins at the Cary facility, and that these presented a health hazard.

We conclude that Plaintiffs presented far more than a scintilla of evidence that his bilateral vestibular dysfunction was caused by exposure to mold in the Cary facility. Plaintiffs' evidence easily passes

the threshold to submit the issue of causation to the jury, and thus the trial court did not err by denying Defendant's motion for directed verdict and JNOV. We have considered Defendant's arguments to the contrary and reject them.

Defendant argues that Dr. Farmer's opinion was based on "mere conjecture and speculation." As discussed above, Dr. Farmer performed various tests on Mr. Cameron, and his notes indicate that "neurological work ups including MRI scans of the cervical spine and brain were unremarkable. There was no indication of other causes such as Arnold Chiari Syndrome, multiple sclerosis, brain tumor or posterior fossa tumor, or other degenerative central nervous system disease. Also, there is no past history of known ototoxic drug exposure." Having eliminated the other causes of Cameron's symptoms, Dr. Farmer concluded that Cameron's vestibular dysfunction was most likely caused by ototoxicity, or poisoning of the ear. Other evidence established that exposure to toxigenic molds can cause vestibular dysfunction, and that Cameron had been exposed to toxic mold at the Cary facility. When Dr. Farmer learned this, he concluded that the ototoxin causing Cameron's vestibular dysfunction was a mycotoxin, or mold byproduct, to which Cameron was exposed at the Cary facility. Clearly, his opinion was based on far more than speculation.

Defendant also urges that our determination of the sufficiency of expert evidence of medical causation "depends upon the totality of the evidence," in support of which Defendant cites *Poole v. Copland, Inc.*, 125 N.C. App. 235, 481 S.E.2d 88 (1997), *rev'd on other grounds*, 348 N.C. 260, 498 S.E.2d 602 (1998). However, *Poole* does not hold that appellate review of expert medical causation must include assessment of the totality of the evidence. Rather, it addresses a situation not present in the instant case, when an expert's testimony is limited to the opinion that something "might" or "could" have caused a Plaintiff's condition: "Whether 'could' or 'might' will be considered sufficient depends upon the general state of the evidence. . . . Cases finding 'could' or 'might' expert testimony to be sufficient often share a common theme—additional evidence which tends to support the expert's testimony." *Poole*, 125 N.C. App. at 241, 481 S.E.2d at 92. Thus, *Poole* permits review of additional evidence, but certainly does not require a whole record type of analysis. Accordingly, we reject Defendant's suggestion that the testimony of Dr. Farmer should be "viewed as a whole with the testimony of Drs. Johanning, Tulis, Darcey and Sandler[.]"

Defendant acknowledges that Dr. Farmer "tested [P]laintiff extensively" and "ruled out both the primary known causes of vestibular dysfunction . . . and the lesser known causes" before diagnosing Plaintiff with bilateral vestibular dysfunction that Dr. Farmer believed was caused by ototoxicity, or exposure of the inner ear to a toxic substance. It also concedes that Dr. Farmer subsequently identified *Stachybotrys* mold as the toxic agent that probably was responsible for Plaintiff's condition. The record is clear that Dr. Farmer's diagnosis was based on his testing of Plaintiff to rule out other causes, Plaintiff's history of exposure to mold toxins, and Dr. Farmer's review of Dr. Johanning's article on the subject. This being sufficient to defeat Defendant's directed verdict motion, we do not engage in weighing this evidence in the context of all the evidence. This assignment of error is overruled.

**[2]** Defendant's remaining arguments regarding causation attempt to draw our attention to various weaknesses or inconsistencies in Plaintiffs' evidence, or to Defendant's contrary evidence. However, in our review of whether Plaintiffs "made out a *prima facie* case sufficient to withstand a motion for a directed verdict, the evidence must be viewed in the light most favorable to caveators, deeming their evidence to be true, resolving all conflicts in their favor, and giving them the benefit of every reasonable favorable inference." *In re Will of Dupree*, 80 N.C. App. 519, 521, 343 S.E.2d 9, 10 (1986) (citations omitted). "[T]his Court 'does not have the right to weigh the evidence and decide the issue on the basis of its weight.' . . . Although by doing so, it is possible to find a few excerpts that might be speculative, this Court's role is not to engage in such a weighing of the evidence." *Alexander v. Wal-Mart Stores, Inc.*, 166 N.C. App. 563, 573, 603 S.E.2d 552, 558 (2004) (Hudson, J., dissenting) (quoting *Adams v. AVX Corp.*, 349 N.C. 676, 681, 509 S.E.2d 411, 414 (1998)), *rev'd per dissent*, 359 N.C. 403, 610 S.E.2d 374 (2005).

Without making any new arguments Defendant also asserts that if this Court disagrees that the motion for JNOV should have been granted, Defendant is nonetheless entitled to a new trial, on the grounds that the jury's verdict was against the greater weight of the evidence.

"The power of the court to set aside the verdict as a matter of discretion has always been inherent, and is necessary to the proper administration of justice." The trial judge is "vested with the discretionary authority to set aside a verdict and order a new trial whenever in his opinion the verdict is contrary to the

greater weight of the credible testimony." Since such a motion requires his appraisal of the testimony, it necessarily invokes the exercise of his discretion. It raises no question of law, and his ruling thereon is irreviewable in the absence of manifest abuse of discretion.

*Britt v. Allen*, 291 N.C. 630, 634-35, 231 S.E.2d 607, 611 (1977) (quoting *Bird v. Bradburn*, 131 N.C. 488, 489, 42 S.E. 936 (1902); and *Roberts v. Hill*, 240 N.C. 373, 380, 82 S.E.2d 373, 380 (1954)). "Our review of a discretionary ruling denying a motion for a new trial is limited to determining whether the record demonstrates that the trial court manifestly abused its discretion." *Godfrey v. Res-Care, Inc.*, 165 N.C. App. 68, 83, 598 S.E.2d 396, 406 (citing *Pittman v. Nationwide Mutual Fire Ins. Co.*, 79 N.C. App. 431, 434, 339 S.E.2d 441, 444 (1986)), *disc. review denied*, 359 N.C. 67, 604 S.E.2d 310 (2004).

Defendant fails to articulate any specific abuse of discretion, and we conclude that the trial court did not abuse its discretion in overruling Defendant's motion. This assignment of error is overruled.

---

**[3]** Defendant next challenges the admission of the following evidence: (1) testimony of several of Cameron's co-workers about respiratory and other medical complaints they reported to Defendant; (2) evidence of an OSHA complaint addressed to Merisel Americas, not a party in the trial; and (3) testimony by Dr. Albert Link and Ken Kopel pertaining to damages. Defendant argues that is entitled to a new trial because the trial court erroneously admitted this evidence. We disagree.

Preliminarily, we note Plaintiffs' argument that Defendant failed to preserve for appellate review the admissibility of much of the testimony challenged on appeal. For example, Defendant did not renew his objections at trial to the testimony of Cameron's co-workers. Nor did Defendant object to the trial court's jury instructions. Further, Defendant explicitly informed the trial court that it did not object to Ken Kopel's testimony, but only to certain conclusions that might be drawn from such testimony. Plaintiffs' waiver arguments may well have merit. However, we conclude that even assuming, *arguendo*, that Defendant preserved its right to appellate review of the admission of the challenged evidence, the trial court did not commit reversible error in its admission.

"Admission of evidence is 'addressed to the sound discretion of the trial court and may be disturbed on appeal only where an abuse of such discretion is clearly shown.' Under an abuse of discretion standard, we defer to the trial court's discretion and will reverse its decision 'only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.' " *Gibbs v. Mayo*, 162 N.C. App. 549, 561, 591 S.E.2d 905, 913 (quoting *Sloan v. Miller Building Corp.*, 128 N.C. App. 37, 45, 493 S.E.2d 460, 465 (1997); and *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985)), *disc review denied*, 358 N.C. 543, 599 S.E.2d 45 (2004).

We first consider the testimony of certain of Plaintiff's co-workers about upper respiratory and ear, nose, and throat medical problems they experienced between 1998-2000, and their efforts to bring this to the attention of Defendant's personnel. Defendant acknowledges that this testimony was admitted solely to show notice to Defendant, and that the trial court gave the jury a limiting instruction to that effect. Defendant contends, however, that the testimony was inadmissible and that the limiting instruction was insufficient to cure the prejudicial effect of this testimony. We disagree.

Defendant asserts that the testimony was inadmissible because Cameron's co-workers' health problems were "dissimilar." The record shows that the witnesses testified about problems with upper respiratory conditions and health effects to their ear, nose, or throat. Cameron's condition is centered in his inner ear. The trial court did not abuse its discretion in finding Cameron's and his co-workers' health problems to be sufficiently similar. Defendant also argues that the jury was confused by the testimony, based on a question from one juror about the phrase "if you so find" in one of the trial court's instructions. We conclude that the juror's question, seeking clarification of what was modified by the phrase "if you so find" did not show a general misunderstanding of the issues in the case.

"The general rule regarding admission of evidence is that '[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by the Constitution of North Carolina, by Act of Congress, by Act of the General Assembly, or by [the Rules of Evidence].' N.C.G.S. § 8C-1, Rule 402 [(2005)]." *State v. Campbell*, 359 N.C. 644, 672, 617 S.E.2d 1, 19 (2005). It is true that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, . . . or needless

presentation of cumulative evidence." N.C. Gen. Stat. § 8C-1, Rule 403 (2005). However:

> The decision whether to exclude evidence under Rule 403 of the Rules of Evidence is within the discretion of the trial court and will not be overturned absent an abuse of discretion. "Abuse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision."

*Campbell*, 359 N.C. at 673, 617 S.E.2d at 19 (quoting *State v. Hennis*, 323 N.C. 279, 285, 372 S.E.2d 523, 527 (1988)) (citations omitted). We conclude that the trial court acted within its discretion to admit the testimony of Cameron's co-workers.

[4] Defendant also argues that the trial court erred by admitting evidence that in January 2000 Candace Miller, at that time in charge of property management for the Cary facility, received an OSHA complaint about the Cary facility's air quality. The basis of Defendant's objection is that the letter was addressed to non-party Merisel Americas, rather than to Defendant Merisel Properties, Inc. We find this argument without merit. The letter was admitted on the issue of notice to Defendant of the presence of mold in the building, and a limiting instruction to that effect was given. The purpose of this evidence was to show that Defendant had notice. Defendant cites no cases, and we find none, holding that otherwise admissible evidence of notice is rendered inadmissible because the information was in an envelope addressed to an associated corporate entity, rather than to Defendant. We conclude that the trial court did not err by admitting this evidence.

Moreover, even assuming, *arguendo*, some error, we further conclude that the admission of the OSHA complaint did not change the outcome of the trial. " 'The burden is on the appellant not only to show error, but to show prejudicial error, *i.e.*, that a different result would have likely ensued had the error not occurred. G.S. § 1A-1, Rule 61 [(2005)].' . . . We also observe that, based on our own review of the evidence, it is highly unlikely that this testimony had any significant effect on the jury's verdict." *O'Mara v. Wake Forest Univ. Health Sciences*, 184 N.C. App. 428, 441, 646 S.E.2d 400, 407 (2007) (quoting *Responsible Citizens v. City of Asheville*, 308 N.C. 255, 271, 302 S.E.2d 204, 214 (1983)). This assignment of error is overruled.

**[5]** Defendant further argues that the trial court erred by admitting the testimony of Ken Kopel and Dr. Albert Link. Ken Kopel is the former president of Ziff Davis Publishing Company and former president and CEO of PC Connection, where Defendant worked after leaving Merisel. Kopel was Defendant's supervisor at PC Connection. Dr. Link was qualified as an expert in the evaluation of past and future economic damages. Defendant argues that it is entitled to a new trial on damages, on the grounds that their testimony should have been excluded. We disagree.

Regarding Ken Kopel, Defendant states that it "independently objected" to his testimony. This is inaccurate. Defense counsel not only <u>did not</u> object to Kopel's testimony, but it explicitly told the trial court that:

> I don't have an objection to Mr. Kopel's testimony or to questions that were asked to him. They're—they're—they're proper questions. And they ask Mr. Kopel, "Do you think that the [P]laintiff could have had this other position?" And his testimony is, well, that he may—he could have been a candidate for the—for that—for that position. And that's fine.

Defendant's only concern about Kopel's testimony was that "the argument that's going to be made from that [by Dr. Link] is, "Well, Mr. Cameron would have had this position[.]" We conclude that the trial court did not err by allowing Ken Kopel to testify.

Regarding Dr. Link's testimony, the record shows that his projections of Cameron's lost income were anchored by several known data points, including Cameron's salary when he left Merisel, his salary at subsequent jobs, and the salary associated with job offers he had been unable to accept. Dr. Link also incorporated the opinions of Cameron's former supervisor, Ken Kopel, into his analysis of the future income Cameron would lose as a result of his disorder. At the time he was deposed, Kopel had not yet been deposed, although Dr. Link was provided with a summary of what Plaintiffs believed Ken Kopel's deposition testimony would be. After Kopel's deposition was taken, Dr. Link was able to refine some of his calculations, based on additional data points. As a result, his projections of Cameron's lost income <u>decreased</u> somewhat. Defendant argues that Dr. Link's testimony should have been excluded, on the grounds that his trial testimony included "previously undisclosed opinions"; that Dr. Link "used a Power Point slide show at trial" which Defendant had not previ-

ously seen; and that Dr. Link had "changed his methodology" between the time of his deposition and the trial. We disagree.

Defendant contends that the differences between Dr. Link's deposition and his trial testimony constitute violation of the rules of discovery, requiring the trial court to strike his testimony. "While the trial court has the authority to impose discovery violation sanctions, it is not required to do so. Therefore, whether sanctions are imposed is within the sound discretion of the trial court and will not be reversed absent an abuse of discretion." *State v. Moore*, 152 N.C. App. 156, 161, 566 S.E.2d 713, 716 (2002) (citing *State v. Hodge*, 118 N.C. App. 655, 657, 456 S.E.2d 855, 856 (1995)). An abuse of discretion exists only when a trial court's ruling is "so arbitrary that it could not have been the result of a reasoned decision." *White v. White*, 312 N.C. 770, 777, 324 S.E.2d 829, 833 (1985).

In the instant case, we conclude that the trial court did not abuse its discretion by denying Defendant's motion to strike Dr. Link's testimony. Dr. Link's trial testimony included certain revised, lower, figures for Cameron's projected lost earnings than his previous higher numbers during deposition. However, Dr. Link's basic approach remained the same: he used various known dollar amounts and percentages for several years before and after Cameron developed vestibular dysfunction, and interpolated where necessary, to create a trajectory that could be used to calculate the amount Cameron would have earned if he were healthy. Further, Dr. Link indicated during his deposition that his figures were somewhat preliminary because Ken Kopel had not yet been deposed. This assignment of error is overruled.

---

[6] Finally, Defendant argues that it is entitled to a new trial on damages or to a remittitur, because the jury's damage award was excessive and unsupported by competent evidence. We disagree.

"It is well established that the trial courts in this State have no authority to grant remittitur without the consent of the prevailing party." *Gardner v. Harriss*, 122 N.C. App. 697, 699, 471 S.E.2d 447, 449 (1996) (citing *Pittman*, 79 N.C. App. at 434, 339 S.E.2d at 444).

Defendant contends that it is entitled to a new trial on damages under N.C. Gen. Stat. § 1A-1, Rule 59(a)(6) (2005) which authorizes the court to grant a new trial for "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice[.]"

Regarding the amount of damages, we have concluded that the testimony of Ken Kopel and Dr. Link was competent on the issue of damages. Dr. Link's expert opinion calculated Cameron's lost earnings at between $4,000,000 and $6,000,000. The jury verdict of $1,600,000 is significantly below the minimum figure projected by Dr. Link. "Whether to grant or deny a new trial is within the sound discretion of the trial court and may not be reviewed absent a manifest abuse of discretion. As there is no evidence to show that the trial court abused its discretion by failing to grant a new trial on the ground that [$1,600,000.00] was an excessive award, [D]efendant's argument is without merit." *Chaney v. Young*, 122 N.C. App. 260, 265, 468 S.E.2d 837, 840 (1996) (citing *Munie v. Tangle Oaks Corp.*, 109 N.C. App. 336, 427 S.E.2d 149 (1993)). We conclude that Defendant is not entitled to a new trial on damages. This assignment of error is overruled.

For the reasons discussed above, we conclude that the trial court did not err and that the judgment below should be

Affirmed.

Chief Judge MARTIN and Judge STROUD concur.