NO. COA14-670

NORTH CAROLINA COURT OF APPEALS

Filed:  3 February 2015

BENJAMIN SUPPLEE and MEBRITT
THOMAS,
     Plaintiffs

v.                                    New Hanover County
                                      No. 12 CVS 3287
MILLER-MOTTE BUSINESS COLLEGE,
INC. and DELTA CAREER EDUCATION
CORPORATION,
     Defendants.


Appeal by defendants from order entered 20 December 2013 by

Judge W. Allen Cobb, Jr., in New Hanover County Superior Court.

Cross-appeal by plaintiff Benjamin Supplee from order entered 31

July 2013 by Judge Phyllis M. Gorham in New Hanover County

Superior Court.  Cross-appeal by Kyle J. Nutt from order entered

27 January 2014 by Judge W. Allen Cobb, Jr., in New Hanover

County Superior Court.  Heard in the Court of Appeals 22 October

2014.


    *Shipman & Wright, LLP, by Kyle J. Nutt, for plaintiff-
    appellee and cross-appellants.*

    *Vandeventer Black LLP, by David P. Ferrell and Kevin A.
    Rust, for defendant-appellants and cross-appellee.*


    McCULLOUGH, Judge.

Defendants Miller-Motte Business College, Inc. and Delta Career Education appeal the order of the trial court denying their motions for directed verdict and judgment notwithstanding the verdict; Plaintiff Benjamin Supplee cross-appeals from the order of the trial court granting defendants' summary judgment motion, in part; Plaintiff Benjamin Supplee's attorney, Mr. Kyle Nutt, appeals the trial court's order granting defendants' motion for sanctions. Based on the reasons stated herein, we affirm in part and reverse in part.

## I.  Background

On 21 August 2012, plaintiffs Benjamin Supplee ("Supplee") and Mebritt Thomas ("Thomas") filed a complaint against defendants Miller-Motte Business College, Inc. ("MMC") and Delta Career Education Corporation ("DCEC"). Plaintiffs alleged the following claims: fraud/fraud in the inducement; unfair and deceptive trade practices; negligent misrepresentation; breach of contract by MMC; and negligence.

On 29 May 2013, defendants filed a motion for summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.

On 31 July 2013, the trial court entered an order, granting defendants' motion for summary judgment in part, and denying it

in part. The trial court found that there were no genuine issues of material fact on plaintiffs' claims for fraud, unfair and deceptive trade practices, negligence, and negligent misrepresentation. Defendants' motion for summary judgment on plaintiffs' breach of contract claim was denied.

Plaintiffs' trials were separated with Supplee's trial occurring first, at the 28 October 2013 civil session of New Hanover County Superior Court, Judge W. Allen Cobb, Jr. presiding.[1]

The evidence at Supplee's trial indicated the following: Sometime after October 2009, Supplee met with MMC's dean of education, Mike Smith ("Smith") and expressed interest in the surgical technology ("surg tech") program at MMC's Wilmington, North Carolina campus. Supplee inquired about the requirements of the surg tech program and job prospects in the field after graduation. The surg tech program was a two year program that consisted of an eighteen month class component, followed by a six month clinical component. Smith gave Supplee MMC's college catalog. Thereafter, Supplee met with Amy Brothers ("Brothers"), an admissions representative for MMC. Supplee

_____

[1]Because plaintiff Benjamin Supplee is the only plaintiff who is a party to the appeal before us, we will focus on the record evidence relevant to Supplee's appeal.

testified that although Brothers was aware that he wanted to apply to the surg tech program, Brothers encouraged him to apply to the health information technology ("HIT") program. Brothers told Supplee that he could transfer to the surg tech program if he did not like the HIT program.

During their meeting, Brothers handed Supplee a document entitled "Career Information Profile." The document asked whether Supplee had "ever been convicted of a crime." Supplee marked "no" after asking Brothers whether "a DUI count[s] because I knew it was on my record, I knew I had some issues in the past and she was like, no, you're fine."

On 10 December 2009, Supplee received an acceptance letter from the campus director of MMC and a congratulatory letter of acceptance from the career services director at MMC. On 15 December 2009, Supplee and Brothers signed an enrollment agreement for an associate degree in the HIT program. The agreement stated that Supplee's enrollment was "subject to all terms and conditions set forth in the Catalog" of MMC. The student catalog, under the heading "PROGRAM REQUIREMENTS" and "Background Checks," provided as follows:

> Students applying for admission will be required to have a criminal history check. While a criminal conviction is not a per se bar to admission, **[MMC] will review any**

> **applicant who has been convicted of a crime in order to determine his or her fitness for admission**, and will take into consideration the following factors: the nature and gravity of the criminal conviction, the time that has passed since the conviction and/or completion of the criminal sentence, and the nature of the academic program for which the applicant has applied.

(emphasis added).

In January 2010, Supplee began his courses at MMC. On 4 April 2010, after the end of the first quarter, Supplee transferred into the surg tech program. To complete the transfer, Supplee signed an enrollment agreement on 14 April 2010, almost identical to the HIT enrollment agreement, that incorporated the terms and conditions of the catalog and stated that MMC would review a student's criminal background for admission purposes. Defendants backdated Supplee's start date in the surg tech program to 20 January 2010.

On 12 October 2010, during Supplee's first surg tech program specific class, he was given a document by defendants entitled "Background Check Statement of Disclosure" which provided as follows:

> Background checks will be provided as part of the curriculum, will be held in strictest confidence and specific information will not be released to the clinical site unless specifically requested by the clinical site administrator. . . . As a student in the

> Surgical Technology Program, I am aware that clinical sites in which I complete my clinical rotations may require proof of a criminal background check prior to my acceptance at the clinical site.

Supplee and Cynthia Woolford ("Woolford"), the program director of surgical technology at MMC, signed this document. Woolford testified that she reviewed the "Background Check Statement of Disclosure" with the whole class, including Supplee.

On or about 12 October 2010, Woolford provided Supplee with the "Surgical Technology Program Student Policy Manual." Under the subsection entitled "Admission," the surg tech manual stated that "[t]he college will perform a criminal background check upon admission to the program." Further, it stated that

> An applicant may be denied admission to the [surg tech] program for any of the following reasons: . . . b. Conduct not in accordance with the standards of a Surgical Technologist: . . . ii. Has been convicted of or pleaded guilty or nolo contendere to any crime which indicates that the individual is unfit or incompetent to practice surgical technology or that the individual has deceived or defrauded the public. . . . e. Due to JCAHO [Joint Commission on Accreditation of Health Organizations] requirements for Hospital & Operating Rooms, Students with a felony criminal record, larceny, or drug-related background found on the criminal background check will not be admitted to the clinical sites.

Supplee testified that he had not been advised by defendants' representatives that a criminal background check had not been conducted, but believed they had already conducted one.

At trial, Woolford testified that based on MMC's written policy, criminal background checks are "supposed to be conducted of new applicants" during the admissions process. Ned Snyder, the campus director for MMC in Wilmington and the regional vice president for MMC in North Carolina, South Carolina, and Virginia testified that MMC had the same policy, regardless of whether the applicant was applying to the HIT or the surg tech program. In addition, regardless of whether the applicant answered "no" to the question of "have you ever been convicted of crime?" on the career information profile, MMC was supposed to run a criminal background check. Woolford testified that, "if a student during admission had a criminal charge that would automatically disqualify them from clinical sites," the purpose of the criminal background check made during admission was to screen out any applicants who would not be able to complete the program. Once a student was admitted, thirty days prior to being placed at a clinical site, MMC was supposed to conduct another criminal check in order to obtain the most recent results. Woolford testified that MMC had a "responsibility to

determine the type of criminal backgrounds that will prohibit students from attending [clinical] externships." However, Woolford admitted that defendants did not conduct a criminal background check on Supplee during his admissions process. Woolford also testified that Supplee did not have a criminal background check conducted prior to the time he started the surg tech program.

Around May of 2011, Supplee's class was scheduled to go to an orientation at two clinical externship sites. Woolford testified that thirty days prior to May 2011, Woolford ordered the background check of Supplee. Prior to May 2011, Woolford was not aware of any criminal background check being conducted on Supplee. A contact at a clinical externship site informed MMC that four students, including Supplee, were not permitted to attend the orientation based on the results of their criminal background checks. Supplee's criminal background check revealed the following: two felony charges of breaking and entering and larceny which were dismissed in 2008; two convictions of driving while intoxicated which occurred in 2004 and 2008, one of which resulted in a probation violation.

Supplee testified that around 15 May 2011, he was pulled out of class by Woolford and told by Smith, that the criminal

background check sent to the clinical site was rejected. Defendants "pointed to two dismissed felony charges and said that's why I was not being allowed to attend the orientation site so therefore I couldn't participate in the clinical portion. I couldn't -- I couldn't finish." Supplee testified that "[Woolford] looked at my background and everything else that I had on there. DUIs, traffic misdemeanors she said was okay, that that wasn't why I was being denied." Defendants presented Supplee with two options: Supplee could transfer into any other program at MMC at no charge or Supplee could get his felony charges expunged and reapply to the surg tech program to work towards completion. At Woolford's suggestion, Supplee elected to get the two felony charges of breaking and entering and larceny expunged. Supplee was successful in getting the charges expunged and reapplied to MMC in December of 2011. When Supplee attempted to reenroll, defendants informed him that their admissions policy regarding criminal background checks had changed, requiring a "clean record."

On 10 January 2012, DCEC sent Supplee a "Notice of Pre-Adverse Action" which stated the following:

> During the application process for the SURGICAL TECHNOLOGY program at [DCEC], you authorized a review of your background and qualifications for admission. This

background check revealed criminal convictions that would almost certainly preclude participation in externship or clinical experience position placements that may be required to successfully complete the program you have applied. Based on this background check, [DCEC] rejects your application.

On 7 November 2013, a jury returned a verdict in favor of Supplee. The jury found that defendants entered into a contract with Supplee, that defendants breached the contract by non-performance, and that Supplee was entitled to recover from the defendants in the amount of $53,481.00. Costs in the amount of $2,298.30 were also taxed against defendants.

On 14 November 2013, defendants filed a motion for judgment notwithstanding the verdict, or in the alternative, motion for a new trial. On 20 December 2013, the trial court denied both motions.

On 14 November 2013, defendants filed a motion for sanctions and/or appropriate relief. Defendants' motion stated that upon the motion of plaintiffs, the trials of Supplee and Thomas were separated; Supplee's trial occurring during the 28 October 2013 civil session and Thomas' trial scheduled for the week of 18 November 2013. Defendants provided that on or about 3 November 2013, a local news station called WECT, posted a story on its website disclosing that Supplee had prevailed on

his breach of contract claim in the amount of $53,481.00 and that the damages were based upon "wasted tuition and lost income opportunities[.]" Defendants claimed that the alleged basis for the damages of "wasted tuition and lost income opportunities" was not a matter of public record. The news story stated that plaintiffs' attorney, Mr. Kyle Nutt ("Mr. Nutt") of Shipman & Wright, LLP, made the following statement:

> the school was contractually obligated to screen their applicants' criminal backgrounds to make sure all potential students could eventually graduate from healthcare degree programs were certain offenses the school was aware of could potentially prevent students from completing required coursework at hospitals.

Mr. Nutt was also attributed to representing that "the school offered Supplee $25,000 at the start of trial to end the matter, but then removed the offer midway through trial." Defendants argue that the statements attributed to Mr. Nutt were not found in the jury's verdict sheet and were not a matter of public record. Furthermore, Mr. Nutt was attributed to stating that "his firm is representing another student going to trial over similar claims this month" and defendants contended that this statement was made with actual knowledge that Thomas' claims were scheduled to occur just two weeks after the article was published. Based on the foregoing, defendants moved the court

to levy sanctions against plaintiff and/or Mr. Nutt and to grant appropriate relief based on their violation of Rule 3.6 of the North Carolina Rules of Professional Conduct and "their public dissemination of information that would not be admitted as evidence at Ms. Thomas' trial and which creates a substantial risk of prejudicing an impartial trial."

On 27 January 2014, the trial court entered an order on defendants' motion for sanctions and/or appropriate relief by concluding that Mr. Nutt's comments created a substantial risk of prejudicing the Thomas jury and that Mr. Nutt's extrajudicial statements were in violation of Rule 3.6(a) and/or 3.3 of the North Carolina Rules of Professional Conduct. Mr. Nutt was sanctioned in the amount of $1,000.00 and defendants were awarded $6,395.50 in attorneys' fees and $20.00 in costs.

Attorneys for plaintiffs, including Mr. Nutt, filed a motion for reconsideration, arguing that defendants waived claims referenced in their motion for sanctions and/or appropriate relief, that vital First Amendment considerations required a liberal construction of the "safe harbor" provisions contained in Rule 3.6(b) of the North Carolina Rules of Professional Conduct, and that under such a construction, Mr. Nutt's statements were protected disclosures as a matter of law.

On 11 February 2014, the trial court entered an order denying plaintiffs' motion for reconsideration.

On 16 January 2014 defendants filed notice of appeal; on 21 January 2014, Supplee filed notice of appeal; and, on 3 February 2014, Mr. Nutt filed notice of appeal.

## II. Discussion

### A. Defendants' Appeal

Defendants raise two issues on appeal. First, defendants argue that the trial court erred by denying their motions for directed verdict and judgment notwithstanding the verdict ("JNOV"). Next, defendants argue that the trial court erred by permitting the jury to consider speculative evidence of Supplee's lost profits and income. We address each of these arguments in turn.

### i. Directed Verdict and Judgment Notwithstanding the Verdict

Defendants contend that the trial court erred by denying their motions for a directed verdict and JNOV where Supplee failed to present sufficient evidence of a breach of contract claim. We reject defendants' arguments and conclude there was sufficient evidence of breach of contract by defendants in order to submit the issue to the jury.

> When considering the denial of a directed verdict or JNOV, the standard of

> review is the same. The standard of review of directed verdict is whether the evidence, taken in the light most favorable to the non-moving party, is sufficient as a matter of law to be submitted to the jury. If there is evidence to support each element of the nonmoving party's cause of action, then the motion for directed verdict and any subsequent motion for [JNOV] should be denied.

*Green v. Freeman*, 367 N.C. 136, 140-41, 749 S.E.2d 262, 267 (2013) (citations and quotation marks omitted). Whether defendants were entitled to a directed verdict or JNOV is a question of law and questions of law are reviewed *de novo*. *Id.* at 141, 749 S.E.2d at 267.

"The elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract." *Branch v. High Rock Lake Realty, Inc.,* 151 N.C. App. 244, 250, 565 S.E.2d 248, 252 (2002) (citation omitted). Here, the parties stipulated that Supplee and defendants entered into a contract. Therefore, the issue before the jury was whether there was a breach of the terms of the contract.

Defendants rely on the holdings of *Ross v. Creighton Univ.,* 957 F.2d 410 (7th Cir. 1992) and *Ryan v. Univ. of N.C. Hospitals*, 128 N.C. App. 300, 494 S.E.2d 789 (1998), and contend that Supplee's breach of contract claim based on the failure of defendants to conduct a criminal background check to determine

if he was fit for admission into the surg tech program is not a recognized cause of action.

In *Ross,* a student accepted an athletic scholarship to attend Creighton University and play on its varsity basketball team. *Ross*, 957 F.2d at 411. Creighton was an "academically superior university" while the student came from an "academically disadvantaged background" and was "at an academic level far below that of the average Creighton student." *Id.* The student attended Creighton from 1978 until 1982, maintained a D average, and obtained 96 out of the 128 credits needed to graduate. When he left Creighton, the student had the overall language skills of a fourth grader and the reading skills of a seventh grader. *Id.* at 412. The student filed a complaint against Creighton, alleging that Creighton was aware of the student's academic limitations at admission and in order "to induce him to attend and play basketball, Creighton assured [the student] that he would receive sufficient tutoring so that he 'would receive a meaningful education while at CREIGHTON.'" *Id.* at 411. The student further alleged that he took courses that did not count towards a university degree at the advice of Creighton's Athletic Department, that the department employed a secretary to read, prepare, and type his assignments, and failed

to provide him with sufficient and competent tutoring that it had promised. *Id.* at 412. The student asserted claims of breach of contract and negligence. The student argued three separate theories of how Creighton was negligent: "educational malpractice" for failing to provide him with a meaningful education and preparing him for employment after college; negligently inflicting emotional distress by enrolling him in a stressful university environment when he was not prepared and by failing to provide remedial programs to assist him; and, "negligent admission" which would allow recovery when an institution admits and then does not adequately assist an unprepared student. *Id.* The district court dismissed all of the student's claims under Federal Rules of Civil Procedure 12(b)(6) for failure to state a claim.

The student appealed and the United States Court of Appeals for the 7th Circuit held that the

> basic legal relation between a student and a private university or college is contractual in nature. The catalogues, bulletins, circulars, and regulations of the institution made available to the matriculant become a part of the contract. . . . It is quite clear, however, that Illinois would not recognize all aspects of a university-student relationship as subject to remedy through a contract action.

*Id.* at 416 (citations and quotation marks omitted). The *Ross* court explained that a breach of contract claim attacking the general quality of an education would be precluded. *Id.*

In order to state a claim for breach of contract, the court in *Ross* held that a plaintiff "must point to an identifiable contractual promise that the defendant failed to honor." *Id.* at 417.

> In these cases, the essence of the plaintiff's complaint would not be that the institution failed to perform adequately a promised educational service, but rather that it failed to perform that service at all. Ruling on this issue would not require an inquiry into the nuances of educational processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise.

*Id.* The *Ross* court read the student's complaint to

> allege more than a failure of the University to provide him with an education of a certain quality. Rather, he alleges that the University knew that he was not qualified academically to participate in its curriculum. Nevertheless, it made a specific promise that he would be able to participate in a meaningful way in that program because it would provide certain specific services to him. Finally, he alleges that the University breached its promise by reneging on its commitment to provide those services and, consequently, effectively cutting him off from *any* participation in and benefit from the University's academic program.

*Id.* Because the student's breach of contract claim would be an inquiry into whether Creighton "had provided any real access to its academic curriculum at all", the *Ross* court reversed the decision of the trial court and stated that "we believe that the district court can adjudicate [the student's] specific and narrow claim that he was barred from *any* participation in and benefit from [Creighton's] academic program without second-guessing the professional judgment of the University faculty on academic matters." *Id.*

In *Ryan*, the plaintiff was a resident who was "matched" with the University of North Carolina Family Practice Program ("University") under the terms of the National Residency Program based on their respective preferences. The plaintiff and the University "entered into a one-year written contract that was renewable, upon the University's approval, each of the three years of the residency program." *Ryan*, 128 N.C. App. at 301, 494 S.E.2d at 790. The plaintiff's residency began on 1 July 1990 and sometime during the plaintiff's second year, problems arose and the University planned to terminate the residency. *Id.* The plaintiff used the internal appeal procedures and executed a contract with the University at the beginning of his third year which stated "in part that plaintiff knew he might

graduate as much as six months later than the normal program." *Id.* The plaintiff graduated three months later than normal and it was undisputed that the plaintiff graduated from an accredited residency program. The plaintiff then initiated an action against the University for breach of contract, educational malpractice, intentional and negligent infliction of emotional distress, civil conspiracy, tortious interference with prospective business relationship, and self-defamation. *Id.* The trial court granted the University's motion to dismiss all claims and the plaintiff only appealed the dismissal of his breach of contract claim against the University. *Id.*

Relying on the holding in *Ross* that in order to state a claim for breach of contract, the student "must point to an identifiable contractual promise that the University failed to honor," our Court in *Ryan* held that although the plaintiff made several allegations in support of his breach of contract claim against the University, only one alleged a specific aspect of the contract that would not involve an "inquiry into the nuances of educational processes and theories." *Id.* at 302, 494 S.E.2d at 791. The plaintiff had alleged that the University breached the "Essentials of Accredited Residencies" by failing to provide a one month rotation in gynecology. Our Court held that the

plaintiff had alleged facts sufficient to support his claim for breach of contract based on the University's failure to provide that one month rotation and reversed the trial court's order. *Id.* at 303, 494 S.E.2d at 791.

Defendants argue that the present case is distinguishable from *Ross* and *Ryan* because while *Ross* and *Ryan* permit a narrow breach of contract claim where a university promises certain educational services *after* enrollment, Supplee's complaint does not allege that defendants failed to provide a specific educational service. Rather, defendants assert that Supplee's argument is a negligent admission case which has already been rejected by *Ross*. We disagree with this characterization.

Based on *Ross*, Supplee's relationship with defendants was contractual in nature. Supplee signed two separate enrollment agreements on 15 December 2009 and 14 April 2010 that incorporated the terms and conditions set forth in the MMC student catalog. The student catalog explicitly stated that students applying for admission would be "required to have a criminal history check" and that MMC "will review any applicant who has been convicted of a crime in order to determine his or her fitness for admission[.]" Therefore, the student catalog

and the aforementioned term became a part of the contract between defendants and Supplee. *See Ross*, 967 F.2d at 416.

Supplee's claim for breach of contract pointed to this "identifiable contractual promise that the [defendants] failed to honor." *Ryan*, 128 N.C. App. at 302, 494 S.E.2d at 791. Supplee specifically alleged in his complaint that defendants had "failed to order, failed to review, or ignored results from the criminal background checks authorized by [Supplee] as part of the admission process." At trial, defendants conceded that although based on defendants' written policy, criminal background checks were "supposed to be conducted of new applicants" during the admissions process, defendants failed to conduct a criminal background check of Supplee during his admissions process in late 2009. Defendants also admitted that Supplee did not have a criminal background check conducted prior to the time he started the surg tech program in early 2010. Had defendants properly conducted a criminal background check of Supplee at admission in 2009, the results would have revealed his two felony charges of breaking and entering and larceny which were dismissed in 2008 and his two convictions of driving while intoxicated which occurred in 2004 and 2008. Defendants' failure to conduct a criminal background check prior to

admitting Supplee was a specific aspect of the contract between defendant and Supplee that would not involve an "inquiry into the nuances of educational processes and theories, but rather an objective assessment of whether the institution made a good faith effort to perform on its promise." *Ross*, 957 F.2d at 417.

Further, defendants argue that even if a contractual duty existed, MMC could not be said to have committed a material breach of contract.  Defendants assert that because Supplee initially applied to the HIT program and an enrollee's criminal background is not an "issue, concern or consideration" to complete the HIT program, even assuming *arguendo* that a contractual duty existed, a material breach could not have been committed.  We reject this argument.

It is well established that "[i]n order for a breach of contract to be actionable it must be a material breach, one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform."  *Long v. Long*, 160 N.C. App. 664, 668, 588 S.E.2d 1, 4 (2003) (citation omitted).  "The question of whether a breach of contract is material is ordinarily a question for a jury."  *Charlotte Motor Speedway,*

*Inc. v. Tindall Corp.*, 195 N.C. App. 296, 302, 672 S.E.2d 691, 695 (2009).

In the case before us, evidence at trial demonstrated that defendants were aware in October 2009 that Supplee intended to pursue a degree in the surg tech program and were aware that criminal background checks were necessary for the completion of the surg tech program. Supplee testified that based on Brother's encouragement to enroll in the HIT program first and her assurance that Supplee could transfer from the HIT program into the surg tech program, Supplee initially enrolled in the HIT program. Supplee also testified that he would not have enrolled in the HIT program were it not for Brother's assurance that he would be able to transfer into the surg tech program. Once Supplee transferred into the surg tech program on 4 April 2010, defendants backdated his start date in the surg tech program to 20 January 2010. This evidence demonstrates that defendants' failure to conduct a criminal check prior to admission into either the HIT or surg tech program substantially defeated the purpose of the agreement or was a substantial failure to perform.

Viewing the foregoing evidence in the light most favorable to Supplee, there was sufficient evidence of each element of

breach of contract to submit the issue to the jury. As such, we hold that the trial court did not err by denying defendants' motions for directed verdict and JNOV.

## ii. Damages

In their next argument, defendants contend that the trial court erred by admitting evidence of Supplee's landscaping business and the income he earned as a car salesman. Defendants argue that this evidence of lost profits and income was speculative and request a new trial on the issue of damages. We find defendants' arguments unconvincing.

> Admission of evidence is addressed to the sound discretion of the trial court and may be disturbed on appeal only where an abuse of such discretion is clearly shown. Under an abuse of discretion standard, we defer to the trial court's discretion and will reverse its decision only upon a showing that it was so arbitrary that it could not have been the result of a reasoned decision.

*Cameron v. Merisel Props.*, 187 N.C. App. 40, 51, 652 S.E.2d 660, 668 (2007) (citations and quotation marks omitted).

In the present case, Supplee testified that prior to enrolling at MMC, he worked as a full-time car salesman from August 2002 until October 2009 when he was laid off. After he was laid off, Supplee received unemployment compensation until the beginning of 2011. When he started school at MMC in 2010,

Supplee began working as a school janitor. In 2011, after he was no longer enrolled at MMC, Supplee worked as an occasional waiter and landscaper. Supplee submitted records reflecting his taxed Social Security earnings and taxed Medicare earnings from 1994 until 2009. Supplee also presented his 2010 tax return and testified that he earned $727.00 in wages, salaries, tips, et cetera and received $16,231.00 in unemployment compensation during the period of time he was enrolled at MMC. For the year 2011, Supplee received $13,644.00 from unemployment compensation. After leaving MMC, Supplee testified that in 2011 he worked for a landscaping company by the name of Flora Landscape and earned $631.35 and also worked for Eddie Romanelli's and earned $2,048.00. Supplee further testified that he began a landscaping business in 2012 and submitted ledgers for the years 2012 through 2013 and testified as to his income in 2012 and 2013.

First, relying on *McNamara v. Wilmington Mall Realty Corp.*, 121 N.C. App. 400, 466 S.E.2d 324 (1996), defendants argue that evidence about Supplee's landscaping business was inadmissible because Supplee did not have an established history of profits; Supplee contended that the profits he earned after he left MMC would have been duplicated in previous years; and, Supplee made

no effort to obtain sales figures and other financial data from similar landscaping businesses in the Wilmington area. Specifically, defendants contend that this evidence was too speculative.

In *McNamara*, the plaintiff leased a space to house a retail custom jewelry store at a mall owned by the defendant. *Id.* at 402, 466 S.E.2d at 326. The parties executed a five year lease and the plaintiff commenced his operations in August 1991. *Id.* at 403, 466 S.E.2d at 326-27. In January or February 1992, the defendant leased a space adjacent to the plaintiff's store to an aerobics studio and a dispute arose in regards to noise emanating from the aerobics studio. *Id.* at 403, 466 S.E.2d at 327. The plaintiff stopped paying rent after April 1992 and abandoned its leased space in December 1992. *Id.* The plaintiff sued the defendant for several claims including breach of contract. *Id.* at 403-404, 466 S.E.2d at 327. The trial court granted the defendant's motion to dismiss all claims, excluding the breach of contract claim and a jury returned a verdict in favor of the plaintiff in the amount of $110,000.00. *Id.* at 404, 466 S.E.2d at 327. On appeal, the defendant contested a denial of a requested peremptory instruction on damages, argued that its motions for directed verdict and judgment

notwithstanding the verdict should have been granted because the plaintiff did not meet his burden of proof with respect to damages, and, in the alternative, sought a new trial on the issue of damages. *Id.* at 407, 466 S.E.2d at 329. At trial, the plaintiff had confined his proof of damages solely to the issue of lost future profits and our Court provided the following:

> Damages for breach of contract may include loss of prospective profits where the loss is the natural and proximate result of the breach. To recover lost profits, the claimant must prove such losses with "reasonable certainty." Although absolute certainty is not required, damages for lost profits will not be awarded based on hypothetical or speculative forecasts.

*Id.* at 407-408, 466 S.E.2d at 329 (citations and quotation marks omitted). Our Court found that the plaintiff did not have an established history of profits and that his evidence of lost profits consisted solely on the testimony of Dr. Craig Galbraith, a professor of management at the University of North Carolina at Wilmington. *Id.* at 408, 466 S.E.2d at 330. Agreeing with the defendants, our Court held that Dr. Galbraith's "calculations were not based upon standards that allowed the jury to determine the amount of plaintiff's lost profits with reasonable certainty." *Id.* at 409, 466 S.E.2d at 330. First, our Court found that Dr. Galbraith's estimation of

the plaintiff's lost profits were based on the unsupported assumption that from January 1992 until the remaining term of the five year lease, the plaintiff's sales would have risen in a linear fashion to the point where they matched the average sales of independent national jewelers. *Id.* Rather, he relied exclusively on data from independent national jewelers without ascertaining whether these jewelers bore any similarity to plaintiff's business." *Id.* Based on the foregoing, our Court held that Dr. Galbraith's reliance on aforementioned data "rendered his calculations too conjectural to support an award of lost profits" and remanded to the trial court for a new trial on the issue of damages. *Id.* at 409-12, 466 S.E.2d at 330-32.

We find the circumstances in *McNamara* to be readily distinguishable from the facts of the present case. The *McNamara* court dealt with lost future profits, which "are difficult for a new business to calculate and prove." *Id.* at 408, 446 S.E.2d at 330 (citation omitted). In *McNamara,* the evidence to support the lost future profits of the plaintiff were held to be too conjectural for the aforementioned reasons. In the case *sub judice*, evidence regarding Supplee's landscaping business was based on actual income earned by Supplee during the years 2012 and 2013. Most importantly, the evidence regarding

Supplee's landscaping business was not used to calculate future lost profits, but was relevant to the jury's determination of whether Supplee was entitled to recover consequential damages from the defendants for breach of contract. As the trial court instructed, the jury could find that Supplee had suffered consequential damages which included Supplee's investment of his personal time as defined by his lost opportunity to earn income during his time of enrollment. Supplee testified that had he not been accepted and enrolled in MMC, he would have continued working. Therefore, evidence of the history of income he earned after his period of enrollment was relevant in the determination of consequential damages. Accordingly, we reject defendants' arguments that the trial court abused its discretion in admitting this evidence.

Second, relying on *Olivetti Corp. v. Ames Bus. Sys., Inc.*, 319 N.C. 534, 356 S.E.2d 578 (1987), defendants argue that the trial court erred by admitting speculative evidence of Supplee's past income as a car salesman when Supplee failed to produce any evidence of any job offers he received while enrolled at MMC. Defendants also assert that this evidence was inadmissible because Supplee admitted he was laid off from a dealership in 2009 and did not voluntarily leave his employment to enroll in

MMC; Supplee admitted that his income was declining at the time of his termination; Supplee testified that there was "no telling what [he] would have done" had he not enrolled in MMC; and, Supplee testified that after he was terminated as a car salesman, he was not returning to an automotive sales position.

In *Olivetti*, the plaintiff, a manufacturer of word processors, appealed the trial court's determination that the defendant, a dealer, was damaged by the plaintiff's misrepresentations. *Id.* at 544, 356 S.E.2d at 584. The trial court found that had it not been for the plaintiff's fraud, the defendant would have become a dealer for another manufacturer of a word processor. *Id.* The North Carolina Supreme Court held that the trial court correctly concluded that the plaintiff made material representations to the defendant, upon which the defendant reasonably relied. *Id.* at 549, 356 S.E.2d at 587. However, the Supreme Court held that "proof of damages must be made with reasonable certainty" and that "in order for [the defendant] to show that it was deprived of an opportunity to make profits, it must first show that there was in fact such an opportunity." *Id.* at 546, 356 S.E.2d at 585-86. Because there was no competent evidence in the record to support the finding made by the trial court that the defendant had such an

opportunity to make profits, the trial court's award of damages to the defendant was vacated. *Id.* at 549, 356 S.E.2d at 587.

After careful review, we find defendants' reliance on *Olivetti* misplaced. In *Olivetti*, the issue on appeal was whether there was competent evidence to support the trial court's finding that the defendant dealer would have become a dealer for another manufacturer had it not been for the plaintiff's misrepresentations. Here, the issue before our Court is whether evidence of Supplee's income as a car salesman is admissible. While the defendant in *Olivetti* sought lost future profits, Supplee's evidence of his income as a car salesman, like the evidence of Supplee's landscaping business, was relevant to the jury's determination of whether Supplee was entitled to recover consequential damages from defendants for breach of contract. Evidence of the history of Supplee's actual income earned prior to enrolling at MMC was probative in the determination of lost opportunity to earn income during his time of enrollment. As such, we reject defendants' argument that the challenged evidence was speculative and hold that the trial court did not abuse its discretion in its admission.

B. Plaintiff Supplee's Appeal

Supplee raises two issues on appeal. Whether the trial court erred by (i) striking portions of his 4 June 2013 affidavit and (ii) granting defendants' motion for summary judgment, in part.

### i.   Striking Supplee's Affidavit

Supplee argues that the trial court erred by striking portions of his 4 June 2013 affidavit.  We disagree.

"Our Court reviews the trial court's ruling on the admissibility of affidavits for an abuse of discretion." *Cape Fear Pub. Util. Auth. v. Costa*, 205 N.C. App. 589, 592, 697 S.E.2d 338, 340 (2010).

It is well established that a party opposing a motion for summary judgment cannot create an issue of fact by filing an affidavit contradicting his prior sworn testimony.  *Wachovia Mortgage Co. v. Autry-Barker-Spurrier Real Estates, Inc.*, 39 N.C. App. 1, 9, 249 S.E.2d 727, 732 (1978).  Our Court has held that where an affidavit contains additions and changes that are "conclusory statements or recharacterizations more favorable to plaintiffs [that] materially alter the deposition testimony in order to address gaps in the evidence necessary to survive summary judgment[,]" the trial court should properly exclude these portions of the affidavits. *Marion Partners, LLC v.*

*Weatherspoon & Voltz, LLP*, 215 N.C. App. 357, 362, 716 S.E.2d 29, 33 (2011). "[I]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact." *Id*. at 362-63, 716 S.E.2d at 33. Furthermore, "the appellant must show not only that the trial court abused its discretion in striking an affidavit, but also that prejudice resulted from that error." *Barringer v. Forsyth County*, 197 N.C. App. 238, 246, 677 S.E.2d 465, 472 (2009) (citation and quotation marks omitted).

In the case before us, Supplee was deposed on 14 May 2013. On 29 May 2013, defendants filed a motion for summary judgment. Thereafter, on 5 June 2013, Supplee filed an affidavit. On 6 June 2013, defendants filed a motion to strike Supplee's affidavit in which they argued that paragraphs four through seven, thirteen, and fifteen of Supplee's affidavit "either materially alter[ed] his deposition testimony or flatly contradict[ed] his prior sworn testimony." On 31 July 2013, the trial court entered an order striking paragraphs four through seven, thirteen, and fifteen "because they materially differ

from Plaintiff Supplee's prior, sworn testimony and/or directly conflict with Plaintiff Supplee's prior, sworn testimony."

Paragraphs four through seven of Supplee's affidavit stated the following:

    4.  As part of the enrollment process, I was informed by representatives of [MMC] that a check of my criminal background would be performed.

    5.  As part of the enrollment process, [MMC] representatives also informed me that my acceptance into the school and any program of study I entered would be based upon the results of my criminal background check.

    6.  I was informed by [MMC] representatives that, in the event a conviction was found on my record during the enrollment process, [MMC] would determine whether or not I was fit for admission.

    7.  I agreed to submit to the criminal background check process required by [MMC] as part of the enrollment process to determine my eligibility for the school and any program of study I applied for.

During Supplee's 14 May 2013 deposition, Supplee testified that he revealed all the actions, conversations, and statements made by MMC employees to the best of his recollection. He described his meetings with MMC's dean of education, Brothers, and Woolford and revealed the information that was discussed during those meetings. At no point during his deposition does

Supplee testify that he was informed by MMC representatives that a criminal background check would be performed, that acceptance into a program would depend on the results of that criminal background check, that MMC would determine whether he was fit for admission based on the results of the criminal background check, or that he agreed to submit to the results of the criminal background check as described in paragraphs four through seven of his affidavit. We view paragraphs four through seven of Supplee's affidavit as additions that are comprised of conclusory statements or recharacterizations that are favorable to Supplee and that materially alter his prior deposition testimony. Based on the foregoing, we do not find that the trial court abused its discretion in striking these portions of Supplee's affidavit. Nonetheless, because the substance of paragraphs four through seven are independently corroborated by MMC's "Background Checks" provision included in the student catalog, which provided that students would be required to submit to a criminal history check and that MMC would review any applicant and determine their fitness for admission, we find even assuming *arguendo* that the trial court abused its discretion in striking paragraphs four through seven, Supplee has failed to show any resulting prejudice.

Paragraphs thirteen and fifteen of Supplee's affidavit provided as follows:

> 13. Prior to my dismissal from [MMC], I was never made aware by [MMC] that if I was denied access to one clinical externship facility, I would not be permitted to apply for admission to any other clinical externship facility.
>
> . . . .
>
> 15. Prior to my dismissal from [MMC], I was not aware that being denied access to a single clinical externship facility would immediately prohibit me from graduating from the Surgical Technology Program.

A review of plaintiff's deposition testimony demonstrates that he was aware that based on the results of a criminal background check, there "could be an issue . . . with the clinical sites in general[.]" However, Supplee's deposition testimony fails to indicate that he was aware that being denied to a single clinical externship facility would prohibit him from applying for admission to another clinical externship facility or would prohibit him from graduating from the surg tech program. Thus, paragraphs thirteen and fifteen of Supplee's affidavit do not contradict or materially conflict with his prior deposition testimony; nor do they contain additions and changes that are conclusory statements or recharacterizations more favorable to Supplee that materially alter his deposition

testimony. Yet, even if we were to find that the trial court abused its discretion in striking paragraphs thirteen and fifteen of Supplee's affidavit, we hold that this error was not prejudicial as the substance of the paragraphs were contained within paragraph seventeen, which was not struck by the trial court:

> 17. Had I known that the policies of a single third-party clinical site could render my investments, financial and otherwise, in a [surg tech program] degree to be of no value, I would not have enrolled in that program.

Based on the foregoing, we reject Supplee's arguments and affirm the order of the trial court, striking portions of Supplee's affidavit.

## ii. Summary Judgment

In his next argument, Supplee contends that the trial court erred by granting defendants' motion for summary judgment as to Supplee's claims of fraud, unfair and deceptive trade practices (UDTP), negligent misrepresentation, and negligence.

> [W]e review the trial court's order de novo to ascertain whether summary judgment was properly entered. Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.

*Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 87, 747 S.E.2d 220, 226 (2013) (citation and quotation marks omitted). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Hamby v. Profile Prods., LLC*, 197 N.C. App. 99, 105, 676 S.E.2d 594, 599 (2009) (citation omitted).

> The party moving for summary judgment has the burden of establishing the lack of any triable issue. The movant may meet this burden by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim.

*Folmar v. Kesiah*, __ N.C. App. __, __, 760 S.E.2d 365, 367 (2014) (citation omitted).

### a. <u>Fraud</u>

"[T]he essential elements of actionable fraud are: (1) false representation or concealment of a material fact, (2) reasonably calculated to deceive, (3) made with intent to deceive, (4) which does in fact deceive, and (5) resulting in damage to the injured party." *Harrold v. Dowd*, 149 N.C. App. 777, 782, 561 S.E.2d 914, 918 (2002) (citation omitted). "An unfulfilled promise is not actionable fraud, however, unless the

promisor had no intention of carrying it out at the time of the promise, since this is misrepresentation of a material fact." *McKinnon v. CV Indus., Inc.*, 213 N.C. App. 328, 338, 713 S.E.2d 495, 503 (2011) (citation omitted).

In the present case, there are no genuine issues of material fact regarding Supplee's fraud claim because Supplee failed to present any evidence that defendants had the intent to deceive. Ned Snyder, the campus director of MMC at Wilmington, testified in a deposition that it was MMC's practice to run a criminal background check at admissions and at the clinical experience. Woolford also testified that based on MMC's written policy, criminal background checks were "supposed to be conducted of new applicants" during the admissions process. Despite defendants' policy, evidence demonstrated that defendants failed to conduct a criminal background check on Supplee prior to admissions. However, Supplee failed to present specific evidence that at the time of contract formation between Supplee and defendants, defendants had no intention of carrying out its unfulfilled promise; an essential element for a successful fraud claim. Consequently, we hold that the trial court did not err by granting defendants' motion for summary judgment as to Supplee's fraud claim.

b.    <u>UDTP</u>

"In order to prevail under [N.C. Gen. Stat. § 75-1.1(a)] plaintiffs must prove:  (1) defendant committed an unfair or deceptive act or practice, (2) that the action in question was in or affecting commerce, (3) that said act proximately caused actual injury to the plaintiff."  *Canady v. Mann*, 107 N.C. App. 252, 260, 419 S.E.2d 597, 602 (1992).  "[W]hether an action is unfair or deceptive is dependent upon the facts of each case and its impact on the marketplace."  *Norman Owen Trucking, Inc. v. Morkoski*, 131 N.C. App. 168, 177, 506 S.E.2d 267, 273 (1998) (citations and quotation marks omitted).

> If a practice has the capacity or tendency to deceive, it is deceptive for the purposes of the statute.  "Unfairness" is a broader concept than and includes the concept of "deception."  A practice is unfair when it offends established public policy, as well as when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

*Mitchell v. Linville*, 148 N.C. App. 71, 74, 557 S.E.2d 620, 623 (2001) (citations omitted).  Furthermore, "[a] party is guilty of an unfair act or practice when it engages in conduct which amounts to an inequitable assertion of its power or position."  *McInerney v. Pinehurst Area Realty, Inc.*, 162 N.C. App. 285,

289, 590 S.E.2d 313, 316-17 (2004) (citation and quotation marks omitted).

Our case law establishes that "[s]imple breach of contract . . . do[es] not qualify as unfair or deceptive acts, but rather must be characterized by some type of egregious or aggravating circumstances before the statute applies." *Norman*, 131 N.C. App. at 177, 507 S.E.2d at 273. Breach of contract accompanied by fraud or deception, on the other hand, constitutes an unfair or deceptive trade practice. *Unifour Constr. Servs. v. Bellsouth Telcoms.*, 163 N.C. App. 657, 666, 594 S.E.2d 802, 808 (2004).

In support of his UDTP claim, Supplee first argues on appeal that defendants "knowingly made false representations of material fact concerning their intent to perform background checks" and "knowingly omitted material information about the discretion of a single clinical site to unilaterally reject a student for any reason and prohibit the student from finishing the program." As previously discussed, we held that Supplee could not establish a valid claim for fraud based on Supplee's failure to produce evidence that defendants intended to deceive Supplee at the time of contract formation. A review of the record does not reveal any evidence that defendants knowingly

made the alleged false representations or knowingly omitted material about a clinical sites' discretion. Necessarily, Supplee's UDTP claim under the theory of breach of contract accompanied by fraud or deception must fail as Supplee has failed to demonstrate how defendants' breach of contract was characterized by egregious or aggravating circumstances.

Second, Supplee argues that defendants engaged in an unfair practice or act when it took intentional actions amounting to an inequitable assertion of power. Supplee contends that defendants accomplished this by immediately dismissing him from the surg tech program once a single clinical internship site rejected him. We disagree. In Supplee's own deposition, Supplee testifies as to how defendants suggested he get his criminal record expunged and then reapply to the surg tech program. Supplee further testified that defendants offered an option of transferring into another MMC curriculum at no cost to Supplee. These facts do not display an inequitable assertion of power and do not display a practice that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. Rather, the case before us involves a breach of contract based on an identifiable contractual promise that defendants failed to honor. "There is nothing so oppressive or

overreaching about defendant[s'] behavior in breaching the contract that would transform the case into one for an unfair trade practice." *Coble v. Richardson Corp. of Greensboro*, 71 N.C. App. 511, 520, 322 S.E.2d 817, 824 (1984). Accordingly, we affirm the trial court's granting of summary judgment in favor of defendants on Supplee's UDTP claim.

### c.   Negligence

Supplee argues that the trial court erred by granting summary judgment in favor of defendants as to his negligence claim because defendants had a duty to conduct a criminal background check in order to determine his eligibility for admission into and completion of the surg tech program.

In order to state a claim for negligence, a plaintiff must show "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." *Bridges v. Parrish*, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013) (citation omitted).  In *North Carolina State Ports Authority v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 240 S.E.2d 345 (1978), the North Carolina Supreme Court held that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *Id.* at 81, 240 S.E.2d at 350.  However, the *Ports Authority* Court recognized four general categories under which a

breach of contract may constitute a tort action:

(1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee.

(2) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee.

(3) The injury, proximately caused by the promisor's negligent, or willful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.

(4) The injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Id.* at 82, 240 S.E.2d at 350-51 (citations omitted).

We hold that none of the four general exceptions set forth in *Ports Authority* apply to the facts at hand. Rather, this negligence cause of action is analogous to the claim brought forward by the plaintiff in *Ross*. *See Ross*, 957 F.2d at 415 (the plaintiff alleged that a university owed him a duty "to

recruit and enroll only those students reasonably qualified and able to academically perform" at the university). As held in *Ross*, we also hold that recognizing Supplee's cause of action, a "negligent admission" claim, would present difficult "problem[s] to a court attempting to define a workable duty of care." *Id.* Addressing Supplee's "negligent admission" claim would require subjective assessments as to the requirements for admission into the surg tech program, requirements for completion of the surg tech program, requirements of the clinical sites, and the results of Supplee's criminal background check. Because "[r]uling on this issue would . . . require an inquiry into the nuances of educational processes and theories," we reject his claim and affirm summary judgment in favor of defendants on this issue. *Id.* at 417.

### d. Negligent Misrepresentation

Lastly, Supplee argues that the trial court erred by granting summary judgment in favor of defendants on the issue of negligent misrepresentation. We do not agree.

"The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying

party a duty of care." *Howard v. County of Durham*, __ N.C. App. __, __, 748 S.E.2d 1, 7 (2013) (citation omitted).

> Under general principles of the law of torts, a breach of contract does not in and of itself provide the basis for liability in tort. Ordinarily, an action in tort must be grounded on a violation of a duty imposed by operation of law, and the right invaded must be one that the law provides without regard to the contractual relationship of the parties, rather than one based on an agreement between the parties. A failure to perform a contractual obligation is never a tort unless such nonperformance is also the omission of a legal duty.

*Hardin v. York Memorial Park*, __ N.C. App. __, __, 730 S.E.2d 768, 775-76 (2012) (citations and quotation marks omitted).

The allegations in Supplee's complaint and the evidence before the trial court demonstrate that Supplee's claim is that defendants failed to conduct a criminal background check prior to admissions and Supplee's damages were caused by the aforementioned failure. The duty that defendants had to conduct a criminal background check arose under the terms of the contract between the parties and not by operation of law independent of the contract. As such, the breach of that contractual duty cannot provide the basis for an independent claim of negligent misrepresentation. Therefore, we hold that the trial court did not err by granting summary judgment in

favor of defendants on Supplee's claim for negligent misrepresentation.

## C.    Mr. Nutt's Appeal

On appeal, Mr. Kyle Nutt argues that the trial court erred by granting defendants' motion for sanctions.  We agree.

"[A] Superior Court, as part of its inherent power to manage its affairs, to see that justice is done, and to see that the administration of justice is accomplished as expeditiously as possible, has the authority to impose reasonable and appropriate sanctions upon errant lawyers practicing before it." *In re Small*, 201 N.C. App. 390, 394, 689 S.E.2d 482, 485 (2009) (citation omitted).  We review our court's inherent authority to impose sanctions for an abuse of discretion. *Couch v. Private Diagnostic Clinic*, 146 N.C. App. 658, 663, 554 S.E.2d 356, 361 (2001).  "In reviewing a trial court's findings of fact, our review is limited to whether there is competent evidence in the record to support the findings."  *In re Key*, 182 N.C. App. 714, 717, 643 S.E.2d 452, 455 (2007) (citation omitted).

Rule 3.6 of the North Carolina Rules of Professional Conduct provides as follows:

> (a)    A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that the

> lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter.
>
> (b) Notwithstanding paragraph (a), a lawyer may state:
> (1) the claim, offense or defense involved and, except when prohibited by law, the identity of the persons involved;
> (2) the information contained in a public record;
> (3) that an investigation of a matter is in progress;
> (4) the scheduling or result of any step in litigation;
> (5) a request for assistance in obtaining evidence and information necessary thereto[.]

N.C. Revised R. Prof'l. Conduct Rule 3.6(a) and (b). The comment section to Rule 3.6 states that a "relevant factor in determining prejudice is the nature of the proceeding involved. Criminal jury trials will be most sensitive to extrajudicial speech. Civil trials may be less sensitive." N.C. Revised R. Prof'l. Conduct Rule 3.6 cmt.

North Carolina Rules of Professional Conduct Rule 3.3, entitled "Candor Toward the Tribunal," provides that "[a] lawyer shall not knowingly . . . make a false statement of material fact or law to a tribunal or fail to correct a false statement

of material fact or law previously made to the tribunal by the lawyer[.]"  N.C. Revised R. Prof'l. Conduct Rule 3.3(a)(1).

On 27 January 2014, the trial court entered an order on defendants' motion for sanctions and/or appropriate relief.  The trial court made the following pertinent findings of fact:

> 7.  . . .  Plaintiffs moved pursuant to Rule 42 for an order granting each Plaintiff a separate trial.
>
> 8.  In that motion, [Mr. Nutt] represented, among other things, that:  (1) the respective Plaintiffs had "vastly different" criminal records; (2) the charges that "led to each Plaintiffs' dismissal were entirely different"; (3) the Plaintiffs' damages "were different in amount, time period, and nature"; (4) there were "significant factual differences" between the Plaintiffs' respective breach of contract claims; (5) Supplee "has decided to appeal the Court's Summary Judgment Order"; (6) Thomas, "due to the greatly different factual difference in her case and desire to reach a final adjudication in a more timely manner, has expressed her intent to proceed directly to trial"; and (7) it would be "prejudicial and inconvenient for Plaintiff Thomas to be forced to wait for the outcome of the appeal of Plaintiff Supplee's distinctly separate case." . . . .
>
> . . . .
>
> 11. Mr. Nutt [] moved to have Supplee's claim tried first, despite representing to this Court that Thomas desired to have her claim adjudicated in a more

timely manner.  The Honorable Phyllis M. Gorham . . . permitted Supplee's trial to proceed before Thomas' trial.

12.  Supplee's breach of contract claim came on for trial on October 28, 2013, before the undersigned Superior Court Judge.  Thomas' trial was scheduled for November 18, 2013, which was also to be heard by the undersigned[.]

13.  The jury returned a verdict in favor of Supplee on November 1, 2013, in the amount of $53,481. . . .

14.  The jury's verdict sheet did not identify the basis for the award (i.e., whether damages were awarded based on evidence of tuition paid, lost wages, or some combination thereof).

15.  On or about November 3, 2013, WECT posted a story on its website disclosing that Mr. Supplee had prevailed on his breach of contract claim in the amount of $53,481, and that the damages were based upon "wasted tuition and lost income opportunities[.]" . . . .

16.  The alleged basis for the damages, "wasted tuition and lost income opportunities[,]" is not a matter of public record.

17.  Mr. Nutt acknowledged to this Court that he supplied the information to WECT for the article.

18.  Mr. Nutt was reported in the article as stating that "the school was contractually obligated to screen their applicants' criminal backgrounds to make sure all potential students could

eventually graduate from healthcare degree programs w[h]ere certain offenses the school was aware of could potentially prevent students from completing required coursework at hospitals."

19. The specific statements attributed to Mr. Nutt by WECT were not found on the jury's verdict sheet.

20. Mr. Nutt also informed WECT that "the school offered Supplee $25,000 at the start of trial to end the matter, but then removed the offer midway through trial."

21. The settlement amount and withdrawal of the offer was an inadmissible settlement communication, and was likewise not a matter of public record.

22. In the WECT article, Mr. Nutt stated that "his firm is representing another student going to trial over similar claims this month."

. . . .

24. Mr. Nutt represented to WECT that Thomas' case was "similar" to Mr. Supplee's claims, while Mr. Nutt represented and has maintained before this Court that the two Plaintiffs present divergent and distinct fact patterns that necessitated two trials.

. . . .

29. Mr. Nutt's comments created a substantial risk of prejudicing the Thomas jury, and were in violation of Rule 3.6(a) of the North Carolina Rules of Professional Conduct.

>30. Partially as a result of Mr. Nutt's comments to the news media, Defendants settled Thomas' case and avoided a trial, did not pursue their counterclaim against Thomas[.]

Based on the foregoing, the trial court concluded that Mr. Nutt had violated Rule 3.6 of the North Carolina Rules of Professional Conduct "by making extrajudicial statements to the news media" and that Mr. Nutt "knew or reasonably should have known that the extrajudicial statements he made would be disseminated by means of public communication and would have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter." The trial court also concluded that Mr. Nutt either violated Rule 3.6 or Rule 3.3, or both, when he either misrepresented the difference in the plaintiffs' claims or knew or should have known that their cases were not "similar."

First, Mr. Nutt argues that his statements made to the media, excluding his statement concerning the settlement offer made to Supplee, were protected by the "safe harbor" provisions of Rule 3.6(b). Here, the trial court found in findings of fact numbers fifteen through nineteen that Mr. Nutt's extrajudicial comments included stating the basis of the damages awarded by the jury and stating that the defendants were contractually

obligated to screen their applicants' criminal backgrounds to ensure all potential students could successfully complete healthcare degree programs. The trial court found that these statements were not a matter of public record. After thoughtful review, we find that the jury's award of damages and the amount of damages were clearly a matter of public record. Mr. Nutt's extrajudicial statement stating that the basis of damages was "wasted tuition and lost income opportunities" qualifies under Rule 3.6(b), as it pertained to Supplee's claim. Supplee's claim against defendants were specifically for damages based on expenses spent to enroll and participate in classes at MMC and for "forsaken income-earning opportunities." These claims, contained in Supplee's 21 August 2012 complaint, were matters of public record. Mr. Nutt's statement that defendants were "contractually obligated to screen their applicants' criminal backgrounds" also involves the claim involved in the present case, and therefore, are among the subjects a lawyer may state extrajudicially. Thus, we hold that the trial court abused its discretion by finding that the aforementioned statements were sanctionable under Rule 3.6.

We now address the trial court's finding of fact number twenty through twenty-one regarding Mr. Nutt's extrajudicial

statement that defendants made Supplee a $25,000 settlement offer at the start of the trial, which was later removed midway through the trial. The trial court found that this statement was an inadmissible settlement communication and not a matter of public record. Rule 3.6 requires that a lawyer "who is participating or has participated in the investigation or litigation of a matter" may not make an extrajudicial statement that he knows "will have a substantial likelihood of materially prejudicing an adjudicative proceeding *in the matter*." N.C. Revised R. Prof'l Conduct Rule 3.6(a). (emphasis added). Here, the trial court found that Mr. Nutt's statements were made on 3 November 2013, two days after a jury returned a verdict in favor of Supplee. Therefore, we conclude that Mr. Nutt's extrajudicial statement could not have had a substantially likelihood of materially prejudicing Supplee's proceeding as it had already concluded and find that the trial court abused its discretion in finding that this statement violated Rule 3.6.

Next, Mr. Nutt argues that the trial court erred by entering finding of fact number thirty and we agree. Finding of fact number thirty provided that partially based on Mr. Nutt's extrajudicial statements, defendants settled in Thomas' case and avoided a trial. We find nothing in the record to support this

finding.  Mr. Nutt merely stated in his statements to the media that "his firm was representing another student going to trial over similar claims this month" and did not identify Thomas by name.  Additional information about Thomas' claims would have been a matter of public record.

Lastly, Mr. Nutt asserts that the trial court erred by finding that his extrajudicial statements violated Rule 3.3 of the North Carolina Rules of Professional Conduct.  Here, the trial court based its finding of a violation of Rule 3.3 on the fact that while Mr. Nutt represented to the trial court that Supplee's and Thomas' cases "present[ed] divergent and distinct fact patterns that necessitated two trials[,]" Mr. Nutt represented to the media that Thomas' case was "similar" to Supplee's claims.  We conclude that these two representations are not contradictory and do not constitute a "false statement" under Rule 3.3.  It is clear from the record that Supplee and Thomas' 21 August 2012 joint complaint alleged the same legal claims against defendants and that after the 31 July 2013 summary judgment order, the only claim at issue in both Supplee and Thomas' trials was breach of contract.  Mr. Nutt's representations to the media that Supplee and Thomas had similar claims and Mr. Nutt's representations to the trial court that

Supplee and Thomas's cases had "divergent and distinct fact patterns" are not mutually exclusive. Stating that two cases have similar claims as well as "divergent and distinct fact patterns" does not represent a lack of candor toward the tribunal in violation of Rule 3.3.

Based on the foregoing, we hold that the trial court abused its discretion by holding that Mr. Nutt either violated Rule 3.6 or Rule 3.3, or both, and reverse the trial court's 27 January 2014 order on defendants' motion for sanctions.

## III. Conclusion

We affirm the 20 December 2013 order of the trial court denying defendants' motions for directed verdict and judgment notwithstanding the verdict and hold that the trial court did not abuse its discretion by admitting evidence of Supplee's landscaping business and income earned as a car salesman. We hold that the trial court did not abuse its discretion by striking portions of Supplee's affidavit and affirm the 31 July 2013 order of the trial court granting defendants' motion for summary judgment, in part. We reverse the 27 January 2014 order on defendants' motion for sanctions.

Affirmed in part; reversed in part.

Judges CALABRIA and STEELMAN concur.